**J. Marie LOE, as the Legal Representative of her minor son, Nathan Loe, Petitioners,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 89–83V.

United States Claims Court.

Jan. 22, 1991.

special master found that petitioner demonstrated the required elements under § 300aa–11(c)(1), by a preponderance of the evidence. Specifically, Special Master Wright found that:

1) Nathan Loe received a DPT vaccination on June 8, 1983;

2) Nathan Loe received the DPT vaccination in Albany, Oregon;

3) Nathan Loe suffered encephalopathy on June 13, 1983, as a result of receiving the DPT vaccination, and such injury is listed on the Vaccine Table as a compensable injury;

4) Nathan Loe's disabilities, resulting from the encephalopathy, have lasted in excess of 6 months;

5) Petitioner has incurred unreimbursed medical expenses exceeding $1,000; and

6) Petitioner has not previously collected a judgement or settlement in a prior or pending civil action.

Special Master Wright ordered that respondent pay petitioner compensation, primarily in the form of an annuity.[2]

Petitioner raises three objections to the award of compensation. First, petitioner asserts that the special master may order compensation in the form of an annuity only after obtaining the petitioner's consent. As corollaries, petitioner asserts that there is no evidence showing that structuring the compensation in an annuity is in Nathan's best interests, and that the special master has a duty to determine the net present value of the elements of compensation, and did not do so. Petitioner requests that the court calculate the net present value of the compensation, and order that it be paid in four equal installments.

For the reasons discussed below, the court denies petitioner's motion for review and affirms the decision of the special master.

Curtis Webb, Twin Falls, Idaho, for petitioners.

Laura S. Radack, with whom was Asst. Atty. Gen. Stuart M. Gerson, Washington, D.C., for respondent.

## ORDER [1]

MOODY R. TIDWELL, III, Judge.

Under the National Childhood Vaccine Injury Act of 1986, *codified as amended* 42 U.S.C. §§ 300aa–1 to 300aa–33 (West Supp. 1990) (hereinafter "Act"), this matter comes before the court on petitioner's motion for review of Special Master Elizabeth E. Wright's August 1, 1990 Report and Recommendation. Special Master Wright determined that petitioner, J. Marie Loe, as the legal representative of her son, Nathan Loe, was entitled to compensation under the amended National Vaccine Injury Compensation Program (the Program). The

1. This order, including the attached Report and Recommendation of the special master, may contain information that should not be disclosed to a nonparty. *See* 42 U.S.C. § 300aa–12 (1987). Accordingly, within fourteen days of the date of this order, the parties shall designate any material subject to section 300aa–12, and such designated material will be deleted for

public access. If on review of this order neither party files objections within the fourteen-day period, the court will assume that there is no material subject to section 300aa–12.

2. Special Master Wright ordered respondent to pay costs for the first year in one lump sum.

## *DISCUSSION*

Under 42 U.S.C. § 300aa–12(d)(3)(A), a special master determines whether a petitioner is eligible for compensation under the Program, and if so, the amount of that compensation. The appropriate standard of review for that determination appears in the statute, and grants this court the authority to "set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa–12(e)(2)(B). However, a reviewing court may not substitute its own judgment for that of the special master if the special master has considered all relevant factors, and has made no clear error of judgment. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–824, 28 L.Ed.2d 136 (1971); *Gamalski v. Secretary of the Dep't. of Health & Human Servs.*, 21 Cl.Ct. 450, 451–52 (1990); *Hyundai Elec. Indus. v. United States Int'l Trade Comm'n*, 899 F.2d 1204, 1209 (Fed.Cir.1990). Petitioner asserts that ordering compensation in the form of an annuity constitutes an abuse of discretion by the special master.

### I. *The Special Master May Order Compensation In The Form Of An Annuity Without The Consent Of The Petitioner*

Petitioner, relying on § 300aa–15(f)(4)(B), argues that the special master may order the "purchase" of an annuity only with petitioner's consent. The statute reads:

> (B) In the case of a payment of compensation under the Program to a petitioner for a vaccine-related injury or death associated with the administration of a vaccine before the effective date of this subpart the compensation shall be determined on the basis of the net present value of the elements of compensation and paid in 4 equal installments of which *all or a portion of the proceeds may be used as ordered by the special master to purchase an annuity or otherwise be used, with the consent of the petitioner,* in a manner determined by the special

master to be in the best interests of the petitioner.

(emphasis supplied).

Petitioner contends that the issue comes down to one of statutory construction, specifically, that the presence of a comma separating the modifying clause "with the consent of the petitioner" from its immediate antecedent results in its application to all the preceding antecedents. There is some support for this interpretation in the doctrine known as the "rule of the last antecedent." This rule states that a modifying clause generally applies only to its immediate antecedent, but "[e]vidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma." 2A *Sutherland Statutory Construction*, § 47.33 (4th ed. 1984). Petitioner would have the court accept this as an absolute, however, the use of the word "may" does not support this reading. The existence of a comma merely is evidence that a qualifying phrase applies to antecedents more remote than the last one; it is not dispositive. Moreover, the rule of the last antecedent does not override the even more fundamental principal of statutory construction that the statute must be read in its entirety. The court cannot construe a phrase in question without reference to the statute as a whole. *United States v. Morton*, 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984).

In looking at the statute as a whole, if the plain language "does not clearly state the legislature's intent in enacting the law, [the court] look[s] to the legislative history for an explanation of legislative intentions." *Martin J. Simko Const., Inc. v. United States*, 852 F.2d 540, 542–43 (Fed.Cir.1988). An examination of the legislative history of the Program does not provide support for petitioner's contention. The Act did not establish a bottomless cash source for an unlimited pool of petitioners. Instead, Congress limited the number of compensable retroactive petitions to 3500, 42 U.S.C. § 300aa–11(b)(1)(B), as well as the appropriated funds available to pay ret-

roactive claims, 42 U.S.C. § 300aa–15(f)(4)(B) (permitting petitioners to bring a civil action for damages if appropriated funds prove insufficient). In 1989, Congress added the language governing annuities. This addition evidences Congress' concern over the availability of funds to compensate the limited retroactive positions. The low cost of an annuity ensures that a petitioner receives compensation sufficient to provide him care throughout his life, without compromising the availability of funds for subsequent petitioners.

Congress intended that the Act establish a flexible compensation program. *See* H.R. Report No. 247, 101st Cong., 1st Sess., at 510 (1989), U.S.Code Cong. & Admin.News 1989, 1906, 2236. Congress gave this flexibility to the special masters so they could meet the particular needs of many petitioners presenting unique factual situations. By adding the annuity language to § 300aa–15(f)(4), Congress expanded the authority of the special masters. Prior to this amendment, special *masters did not have the authority* unilaterally to order that compensation packages include an annuity. If the court were to read the amended statute as permitting an annuity only with the consent of the petitioner, the addition of this language would add nothing to the special masters' authority, as the lack of the language previously would not have prevented the purchase of an annuity if a petitioner had so agreed. Therefore, Congress must have intended that the 1989 amendment grant authority to the special masters to order an annuity without the petitioner's consent. To construe the provision otherwise "would impermissibly impute a useless act to Congress." *South Corp. v. United States,* 690 F.2d 1368, 1374 (Fed.Cir.1982); *see also* 2A *Sutherland Statutory Construction,* § 46.06 (4th ed.1984). Such a construction "must be viewed as unsound and rejected." *South Corp.,* 690 F.2d at 1374.

Instead, the court believes that "with the consent of the petitioner" applies only to "or otherwise be used." Congress realized that there might be some circumstances in which neither the lump sum payments nor the annuity option would provide the best method of compensation. In these cases, Congress would allow the special masters to use ingenuity and creativity in coming up with a compensation plan. However, Congress was not willing to give the special masters unlimited discretion in this regard, and therefore tempered that grant of authority by requiring that any compensation plan not specifically permitted by the statute (*i.e.,* lump sum payments or annuities) receive the petitioner's consent.

## II. *The Award Of An Annuity Is In The Best Interests Of The Petitioner*

 Petitioner contends that there is no evidence that awarding compensation in the form of an annuity is in Nathan Loe's best interest. The court disagrees. In her decision, Special Master Wright discusses several reasons why the purchase of an annuity benefits the petitioner. An annuity insures that the beneficiary receives a steady stream of income throughout his entire life. An annuity protects the trust's corpus from mismanagement or waste by the parent or guardian. Thus, an annuity eliminates any fear that the compensation might be invested in an unprofitable manner. *Loe v. Secretary of the Dept. of Health & Human Servs.,* No. 89–83V, slip op. at 22, (Ct.Cl.Spec.Master Aug. 1, 1990). Additionally, the parent or guardian is relieved of the burden of having to speculate as to petitioner's life expectancy. *Id.* at 22–23 n. 57.

Annuities also provide favorable tax treatment. Special Master Wright calls attention to the fact that settlements of claims for personal injuries are not subject to federal income tax if the plaintiff takes neither actual nor constructive control of the funds. *Id.* (citing I.R.C. § 104(1)(2) (*sic*); Rev.Rule 79–220, 1979–2 C.B. 74). Thus, taxation will not reduce the amount of compensation awarded to petitioner for Nathan's future care.

The objective of the Program is to compensate children injured by vaccines by ensuring their maintenance for their entire lives. It is the best interests of these children that the special master must consider.

The reasons given for why an annuity is in the petitioner's best interest are comprehensive, and sufficient to defeat petitioner's argument. Although petitioner does not substantively dispute that these reasons are valid, she objects to the fact that no "evidence" (*i.e.*, testimony) was presented to that effect. However, petitioner cites no authority indicating that a special master may not rely on expertise gained in resolving numerous previous cases. The court agrees with respondent that such a suggestion is ludicrous. Additionally, the statute does not mandate testimony for any part of the special master's proceeding on a petition. Instead, the statute provides that the special master *may* require such evidence, information, or testimony "as may be reasonable and necessary." 42 U.S.C. § 300aa–12(d)(3)(B)(i)–(iii). The court cannot say that the reasons upon which Special Master Wright based her decision to order an annuity are arbitrary or capricious.[3]

III. *The Special Master May Determine Net Present Value By Making The Award In The Form Of An Annuity*

■ Petitioner contends that the special master must determine the net present value of the elements of compensation awarded, and that failure to do so constitutes an abuse of discretion. However, because an annuity provides a predictable, inflation-adjusted stream of benefits, the present value calculation occurs through calculation of the contract's purchase price. Therefore, the purchase price of an annuity is a valid measure of the present value of damages. *See Scott v. United States*, 884 F.2d 1280, 1287–88 (9th Cir.1989); *see also Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 552–53, 103 S.Ct. 2541, 2558, 76 L.Ed.2d 768 (1983) (indicating that district courts have wide discretion in choosing method by which to determine net present

value). Special Master Wright's decision also specifically considers the best way of ensuring that the amounts Nathan receives are adequate, even with inflation. *Loe*, No. 89–83V, slip op. at 23.

The Court does not consider the order that compensation be paid in the form of an annuity to be an abuse of the special master's discretion. The duty to determine net present value has been met by ordering the purchase of the annuity.

CONCLUSION

For the reasons stated above, petitioner's motion for review is denied and the court, pursuant to 42 U.S.C. § 300aa–12(e)(2)(A), hereby upholds the special master's Report and Recommendation and attaches it hereto as if fully reproduced in this order, including the recommended findings and conclusions of law. The Clerk of the court is directed to enter judgment accordingly.

IT IS SO ORDERED.

APPENDIX

Office of the Special Masters

No. 89–83V

(Filed August 1, 1990)

DECISION

ELIZABETH E. WRIGHT, Special Master.

On behalf of her son, Nathan Loe ("Nathan"), petitioner filed an application for compensation under the National Childhood Vaccine Injury Act of 1986 [1] ("Vaccine Act" or the "Act"). The petitioner claims that as a direct result of the administration of a diphtheria-pertussis-tetanus ("DPT") vaccination, Nathan suffered an encephalopathy, causing physical handicaps, developmental delay, and learning disabilities. Pursuant to Section 12(d)(3)(A) and Vaccine Rule 10(a), and for the reasons stated be-

---

**3.** The court notes that petitioner apparently did not raise any objections to compensation in the form of an annuity during the course of the proceedings, and presented no evidence showing that an annuity is *not* in Nathan Loe's best interest.

**1.** The statutory provisions governing the Vaccine Act are found in 42 U.S.C.A. §§ 300aa–1 *et seq.* (West Supp.1990). The National Vaccine Injury Compensation Program comprises Part 2 of the Vaccine Act. For convenience, further reference will be to the relevant subsection of "42 U.S.C. § 300aa."

low, the undersigned finds that petitioner is entitled to compensation under the Vaccine Act as set forth, *infra*, for the vaccine-related injury of Nathan Loe. Pursuant to Vaccine Rule 13, a separate decision on the issues of pain and suffering and attorneys' fees and costs shall be rendered.[2]

## PROCEDURAL HISTORY

The petition in this matter was filed on July 25, 1989. On March 9, 1990, a Notice of Appearance was filed on behalf of respondent. By filing dated April 2, 1990, the respondent informed the court that it would engage in limited participation in the above captioned case. Specifically, the respondent submitted a medical report in this case entitled VICB [Vaccine Injury Compensation Branch] Medical Review ("HHS Report") and asked that it be considered as representing respondent's position in this matter.

The HHS Report recommends the denial of compensation in this case. However, respondent notified the court that it was unable to provide additional information in the matter or to participate further in the proceedings before the special master. Under other circumstances, the inability of petitioner to cross-examine the report's author might preclude the report from admission into evidence. However, in the 1989 technical amendments to the Vaccine Act, Congress specifically directed that all interested persons be afforded an opportunity to submit written relevant information.[3] Accordingly, respondent's medical report will be considered herein.

An evidentiary hearing on the joint issues of entitlement to compensation and

damages was held on April 18, 1990, in Portland, Oregon. Respondent did not participate in the hearing.

## ISSUES

The issues to be decided are: (1) whether the petitioner has demonstrated by a preponderance of the evidence that Nathan suffered an encephalopathy due to the administration of a DPT vaccine; (2) whether the respondent has demonstrated by a preponderance of the evidence that Nathan's condition is due to factors unrelated to the administration of the vaccine in question; and, if entitlement to compensation is established; (3) the appropriate level of compensation.

### ·I.

## HEARING RECORD

*Background facts.*

The following facts have been established by the record in this matter.[4]

Nathan was born on February 10, 1983, following a normal prenatal and delivery course. At birth, Nathan weighed eight pounds three and one-half ounces. His Apgar scores [5] were seven and eight, respectively. Other than several bouts of otitis media,[6] Nathan had no significant health problems and was a happy, well-developed child throughout early infancy.

Nathan received his second DPT shot on June 8, 1983.[7] The shot was administered at approximately 4:00 p.m. at the Mid–Val-

---

2. Vaccine Rule 13 provides, in part:

 Any request for attorneys' fees and costs pursuant to 42 U.S.C. § 300aa–15(e) shall be filed no later than 21 days following the filing of an election pursuant to Vaccine Rule 12.

3. Section 12(d)(3)(B)(iv).

4. The evidence in the record in this case consists primarily of petitioner's exhibits ("Ex. ___"), plus testimony taken at the April 18, 1990, evidentiary hearing. ("Tr. at ___"). The HHS Report, filed April 2, 1990, constitutes the only evidence submitted by respondent.

5. An Apgar test measures heart rate, respiration, muscle tone, responsiveness to stimulation, and skin color. Generally two tests are conducted at exactly one minute and five minutes after birth. A perfect score is ten. *The Merck Manual of Diagnosis and Therapy* 986 (13th ed.1977).

6. Otitis media is an inflammation of the middle ear. *Dorland's Illustrated Medical Dictionary* 1202 (27th ed.1988) (hereafter *"Dorland's"* at ___").

7. Nathan's only reaction to his first DPT vaccination was a slight fever.

ley Children's Clinic in Albany, Oregon.[8] Other than a slightly elevated temperature,[9] neither of Nathan's parents recall any reaction or change in behavior until the morning of June 13, 1983, four and one-half days after the administration of his DPT shot.

At 6:00 a.m. on the morning of June 13, 1983, Mrs. Loe heard Nathan wheezing and found her child tangled in his blanket, "burning up, ... eyes glazed over and mucous coming out of his nose." Tr. at 16–17. The Loes rushed Nathan to the emergency room at Albany General Hospital where he was admitted with a temperature of 108.-2.[10] The Albany General records reflect that Nathan was cyanotic and suffering seizures with jerking observed in his head and extremities. He was given phenobarbital intravenously to control his convulsions. His electroencephalogram readings were abnormal. His CAT scan was normal. A variety of diagnostic tests were performed to rule out sepsis or meningitis, including a lumbar puncture, blood culture, CBC, and blood gasses. The tests revealed no etiology for Nathan's condition and the attending physicians elected to transfer the child to the intensive care unit of Oregon Health Sciences University ("OHSU"). Nathan's final diagnosis upon discharge from Albany General was status epilepticus and acute encephalitis with liver and kidney failure.

OHSU medical records note that Nathan had suffered hyperthermia and encephalopathy. At OHSU, Nathan continued to seize. His neurological indicators were abnormal—he was comatose and emitted a "high pitched cry." Ex. 3 at 1. However, he was afebrile during his entire stay at OHSU. Further testing was performed: bacterial and viral cultures were negative and remained negative throughout his hospital course. His EEG's continued to be abnormal. Nathan was hyperthermic. On his second day of hospitalization, he developed a disseminated intravascular coagulation ("DIC"). The treating physicians could not determine the cause of Nathan's encephalopathy.[11] Nathan was released from OHSU in stable condition. The records reveal a final diagnosis of neurological deficit.[12]

## II.

### THE STATUTORY REQUIREMENTS

The Vaccine Injury Table lists certain injuries and conditions which, if found to occur within a prescribed period of time, create a rebuttable presumption of causation. In such "on Table" cases, petitioners do not need to adduce proof of actual causation. Petitioner herein concedes that Nathan's encephalopathy did not fall within the requisite statutory period, and in fact, Nathan was asymptomatic during the three days following his DPT shot. In a case such as this, where the alleged injury does not occur within the time frame set forth in the Table, the Vaccine Act requires the petitioner to establish the following elements by a preponderance of the evidence before compensation can be awarded: [13]

---

**8.** At the time of the DPT injection, Nathan had a mild cold and an ear infection for which his pediatrician had prescribed the antibiotic Amoxicillin two weeks earlier. When his DPT shot was administered, the doctor observed that the otitis media was "poorly resolved" and changed Nathan's Amoxicillin prescription to Septra. *See* Medical Records Submitted in Support of Petition for Vaccine Compensation, Vol. 1, Ex. 3 at 4, 5, 11, 12.

**9.** Mrs. Loe recalls that the evening of June 8, 1983, Nathan ran a mild fever of under 100° for which she gave him Tylenol.

**10.** The medical records are inconsistent with respect to Nathan's temperature upon admission. Some record his admitting fever at 108.2°, while others list it as 109°.

**11.** His OHSU medical records do note, "there was a question as to whether the hyperthermia and encephalopathy might have been related to his DPT immunization five days before. However, this period of time did seem rather long and we are basically unclear about this problem." Ex. 3 at 2.

**12.** Upon return from the hospital, Nathan's physical and mental development regressed from milestones he had achieved prior to the DPT vaccination. He could not roll over, he made fewer sounds, and he had to relearn to eat because he could not suck properly.

**13.** Section 13(a)(1)(A).

(1) petitioner received a vaccine listed in the Vaccine Injury Table;[14]

(2) the vaccine was administered in the United States;[15]

(3) petitioner sustained an injury listed on the Table which was caused by the vaccination;[16]

(4) petitioner's injuries lasted for more than 6 months;[17]

(5) petitioner incurred more than $1,000 in unreimbursed medical expenses;[18] and

(6) petitioner has not previously collected a judgment or settlement in a prior or pending civil action.[19]

In addition, where, as here, the injured person is a minor, the action must be brought by the victim's legal representative.[20]

Once the petitioner establishes a prima facie case, the burden then shifts to the respondent who must prove by a preponderance of the evidence that the claimed injury is attributable to some factor unrelated to the vaccine.[21] Such factors may not include "any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition."[22]

## III.

## FULFILLMENT OF THE STATUTORY REQUIREMENTS

Section 14(a)(I) lists DPT as a covered vaccine. Nathan Loe received a DPT vaccine on June 8, 1983. Ex. 1. The vaccine was administered in Albany, Oregon. Tr. at 21. On June 13, 1983, Nathan suffered an encephalopathy, also listed on the Table as a compensable injury. Section 14(a)(I);

Ex. 2, 3; HHS Report at 1, 2. The disabilities resulting from Nathan's encephalopathy have lasted in excess of six months. Tr. at 53. Petitioner has incurred more than $1,000 in unreimbursed medical expenses as a result of Nathan's injuries. Tr. at 38. Further, petitioner has not collected any judgment or settlement in any civil action, and her previously filed action has been dismissed. Ex. 18. As the duly appointed legal representative of her minor son, Nathan Loe, J. Marie Loe has the requisite capacity to bring this action.[23]

Since all of the essential jurisdictional requisites have been satisfied, if petitioner proves that Nathan's June 13, 1983, encephalopathy was caused by the June 8, 1983, DPT vaccination, then she has satisfied her initial burden of causation. In order to demonstrate entitlement to compensation in an off-Table case, petitioner must present evidence of actual causation. "Simple similarity to conditions or time periods listed in the Table is not sufficient evidence of causation; evidence in the form of scientific studies or expert medical testimony is necessary to demonstrate causation for such a petitioner." H.R. Rep. No. 99–908, 99th Cong.2d Sess., pt. 1 at 15 (1986), U.S.Code Cong. & Admin.News 1986, 6287, 6356. It is against this standard that petitioner's claim is measured. In considering the testimony presented at the hearing, the undersigned found all of petitioner's witnesses credible and convincing. Upon close examination of the record, there is a preponderance of evidence establishing that Nathan Loe suffered an encephalopathy caused by the administration of the DPT vaccine.

---

14. Section 11(c)(1)(A).

15. Section 11(c)(1)(B)(i)(I).

16. Section 11(c)(1)(C)(ii)(II).

17. Section 11(c)(1)(D)(i).

18. Section 11(c)(1)(D)(i).

19. Section 11(c)(1)(E).

20. Section 11(b)(1)(A).

21. Section 13(a)(1)(B).

22. Section 13(a)(2)(A).

23. Nathan's parents, Rodney Loe and Marie Loe are divorced. Under their divorce decree, the parents have joint custody of their two minor children. By order dated May 24, 1990, the Circuit Court for the State of Oregon, with jurisdiction over the Loe's divorce decree and attendant child custody provisions, designated Marie Loe as Nathan's legal representative for the purposes of this proceeding. Ex. 23.

Petitioner's expert, Dr. James Schimshock,[24] testified that Nathan's encephalopathy was caused by the DPT vaccine, particularly the pertussis component. He noted that although the majority of pertussis-induced encephalopathies occur within three days, there are "outliers." Tr. at 74, 76, 78. He believes, to a reasonable degree of medical certainty, that Nathan Loe is one such outlier.

In Dr. Schimshock's opinion, Nathan's 108.2° fever and accompanying seizures were both a reaction to the DPT vaccination. Dr. Schimshock based his conclusion in part on the temporal relationship between the inoculation and the encephalopathy. In addition, he looked to the medical literature for support. First, he noted that temperature elevation was one sequela of pertussis inoculation.[25] Dr. Schimshock acknowledged that the symptoms of the sample groups in the cited studies were not examined beyond 48 hours. With respect to Nathan's particular encephalopathic reaction, Dr. Schimshock cited the *National Childhood Encephalopathy Study* ("NCES") which found "statistically significant associations between the onset of the

various neurological disorders noted and immunization with DPT vaccine within the previous 7 [seven] days." Ex. 6 at 141.[26] Moreover, Dr. Schimshock observed, under guidelines established for pediatric practice, an encephalopathy within seven days is an "absolute counterindication" to future administration of vaccination.[27]

In addition to support in applicable medical literature, Nathan's unique clinical profile provides evidence that the DPT vaccination caused his condition. While the absence of alternative etiologies does not prove causation in fact, it may be considered as a factor in determining whether petitioner has met her burden of proving causation.[28] Despite a barrage of diagnostic testing, no identifiable cause, other than the DPT shot, appears in the child's medical records. His condition was not a simple febrile seizure: Dr. Schimshock testified that by definition, febrile seizures do no damage. Further, febrile seizures are characterized by a single fever spike with a convulsion evident on the upswing of that spike. Conversely, at OHSU Nathan was in a state of continuous seizure, without

---

24. Dr. Schimshock is board certified in pediatric neurology. He has been examiner for the American Board of Neurology and Psychiatry. Dr. Schimshock was the director of both the Epilepsy Center of Oregon and the Child Neurology Clinic of Portland's Good Samaritan Hospital and Medical Center. Currently, Dr. Schimshock is the Director of Child Neurology and Developmental Neurology at Emanuel Hospital and assistant clinical professor of neurology at the University of Oregon Medical School. Ex. 9. Dr. Schimshock has treated several patients suffering from post-pertussis encephalopathies. He has interviewed Marie and Rodney Loe, reviewed Nathan's medical records, and examined the child.

25. *See* Ex. 5, Barkin and Pichichero, Diphtheria–Pertussis–Tetanus Vaccine: Reactogenicity of Commercial Products, *Pediatrics* at 256, 257 (Feb.1979) (noting systemic febrile response in the majority of cases studied); *accord,* Cody et al., Nature and Rates of Adverse Reactions with DPT and DT Immunizations in Infants and Children, *Pediatrics,* at 650 (Nov.1981); *see also, Tinnerholm v. Parke Davis & Co.,* 285 F.Supp. 432, 440 (S.D.N.Y.1968), *aff'd in part, modified in part on other grnds,* 411 F.2d 48 (2nd Cir. 1969) ("fever is one of the recognized etiologies

or causes of post-pertussis vaccine encephalopathies").

26. *See e.g., Bailey v. Secretary of Health and Human Services,* Cl.Ct. No. 88–56V (Order for Entry of Judgment Dec. 20, 1989) (adopting special master's decision with respect to causation). In *Bailey,* an off-Table case, the special master found the *NCES* finding with respect to the seven day period probative on the issue of whether the vaccine in fact caused the injuries in question.

27. Tr. at 82; Ex. 17, *Report of the Committee on Infectious Disease,* at 321 (1988). Dr. Schimshock also noted that the fact that Nathan was suffering from an ear infection at the time he was administered the vaccine might be sufficient reason not to inoculate the child.

28. A reasonable factfinder may consider lack of evidence of another cause in determining whether a party has satisfied its burden of proving that a vaccine caused an encephalopathy. *See e.g., Ezagui v. Dow Chemical Corp.,* 598 F.2d 727, 735 (2nd Cir.1979) (finding no proof of alternative cause relevant on the issue of proximate cause and determining that the trial court had improperly dismissed plaintiff's vaccine

temperature, rather than the brief convulsive episode characterizing febrile attacks.[29]

The fact that all of Nathan's diagnostic tests were negative, revealing no viral, bacterial, traumatic, metabolic, or toxic cause other than the DPT vaccine, is significant.[30] As Dr. Schimshock explained, such a finding is wholly consistent with pertussis encephalopathies which leave:

> ... relatively few footprints. There are no marker studies that you can do that absolutely confirm that this was the reaction. You can't find a trace or bacteria. You can't find a viral imprint. There is really nothing specific about the damage to the nervous system that occurs ...

Tr. at 61. Given the sudden onset of his extremely high fever, and the extent and severity of Nathan's neurological symptoms,[31] Dr. Schimshock testified that some identifiable agent must be responsible. On the record herein, the DPT vaccine is the only conceivable agent.

The undersigned finds the evidence presented in the instant case compelling and concludes that petitioner has satisfied her initial burden. In reaching that conclu-

sion, the undersigned notes that Congress enacted the Vaccine Act in part to reduce the numerous complex issues facing vaccine litigants in traditional civil forums. However, in off-Table cases, proof of causation mirrors the inquiry into proximate cause in cases adjudicated in civil courts. While not binding, these civil tort vaccine cases are probative in determining whether the petitioner has satisfied her burden of proving causation by a preponderance of the evidence.

In *Tinnerholm v. Parke Davis & Co.*, the court was presented with a factual scenario not unlike the case in point.[32] In finding by a preponderance of the evidence that the vaccine caused the infant's encephalopathy, the district court noted that "[i]t is not the plaintiff's burden to disprove every possible ground of causation suggested ... nor must the findings of the Court meet the standards of the laboratorian." *Tinnerholm*, 285 F.Supp. at 440. Rather, the petitioner must show a "logical sequence of cause and effect."[33] Accordingly, the fact that the petitioner cannot identify the precise biological or immunological *mechanism* by which the vaccine

claim); *Strother v. Secretary of Health and Human Services,* 18 Cl.Ct. 816, 823 (1989).

**29.** Dr. Schimshock testified that febrile reactions are "never associated with prolonged seizures." Tr. at 63–64.

**30.** *See e.g., Tinnerholm v. Parke Davis & Co.,* 411 F.2d 48 (2nd Cir.1969). In *Tinnerholm,* the vaccine in question was Quadrigen, DPT combined with the Salk polio vaccine. The Second Circuit found the trial court "justified in finding and giving weight to the fact that Quadrigen is capable of causing exactly the symptoms that occurred to the infant plaintiff and that no other apparent cause of these symptoms was ever brought to light." *Id.* at 53 (emphasis added).

**31.** Dr. Schimshock testified that he has not seen "more than two children in 25 years of practice who have ever experienced a temperature of 107 degrees. The other child didn't survive." The doctor elaborated that he has "never seen anybody just experience a temperature of 107 degrees and then not have at least some obvious explanation for it." Tr. at 74–75.

**32.** In *Tinnerholm,* the vaccine administered was Quadrigen. However, with respect to the symp-

tomatic manifestations of encephalopathy, the cases are notably similar. With the apparent exception of an otitis media, Eric Tinnerholm was a healthy infant when his mother brought him to his doctor for vaccination. Eric suffered no immediate side effects following the injection and continued in apparent good health for the next two days. On the third day, he was somewhat quieter than usual, and on the fourth day, his mother found him tangled in his bed clothes and bathed in sweat. His temperature was 108°. He was cyanotic, and suffered seizures. His doctors suspected meningitis or sepsis, but all laboratory tests were negative. 285 F.Supp. 432. *See also, Ezagui,* 598 F.2d at 730 (encephalopathic infant with no apparent symptoms until *five* days after vaccination when hospitalized with 108° temperature).

**33.** In *Strother v. Secretary of Health and Human Services,* Judge Radar dismissed claimant's case where the petitioner's experts could not state to any degree of medical certainty that the vaccine in question caused the encephalopathy 19 months later. *Compare, Strother,* 18 Cl.Ct. at 821–22 *with Shaw v. Secretary of Health and Human Services,* 18 Cl.Ct. 646, 651 (1989) (relying on statement of experts as to belief). In the instant case, Dr. Schimshock has clearly stated

produces an encephalopathy is not fatal to her claim.[34] In the instant case, the petitioner has proven by a preponderance of the evidence that the administration of a DPT vaccine on June 8, 1983, caused Nathan Loe's June 13, 1983, encephalopathy.

The undersigned further finds that the record does not contain a preponderance of evidence that some other agent caused Nathan's condition. Respondent contends that Nathan's "clinical presentation of acute encephalopathy, hepatic and renal dysfunction and DIC would be consistent with an acute septic process, most likely of viral etiology, despite the inability to isolate an organism." HHS Report at 2. As an initial matter, it is unclear if respondent is suggesting that the cause of Nathan's encephalopathy was viral or bacterial. As Dr. Schimshock explained, sepsis is a bacterial process.[35] Its viral analogue is viremia.

In either event, Dr. Schimshock testified that Nathan Loe was neither septic nor did he suffer any form of viremia. As he explained, virus can usually be identified. In addition, the course of viral infections is unlike the course of Nathan's encephalopathy. With respect to bacterial or septic processes, Dr. Schimshock stated that Nathan did not have a stiff neck or "cells in the spinal fluid. The spinal fluid sugar was not low [as is typical] if there is a bacterial infection of the spaces around the brain." Tr. at 96.

Under any standard, bare allegations cannot satisfy a litigant's ultimate burden of proof.[36] Once the petitioner satisfies her initial burden, it is not enough that

Nathan's condition be "consistent" with other causes.[37] Despite exhaustive diagnostic testing, and except for the speculative conclusions of respondent's medical reviewers, no reviewing doctor has ever determined that Nathan Loe's encephalopathy was the result of a septic or viral process. The absence of any proof of alternative causation clearly prevents a finding by a preponderance of evidence that Nathan's injuries were caused by factors unrelated to the administration of the vaccine.

Finally, even were allegations sufficient to satisfy the burden of proof under traditional civil standards, respondent concedes that Nathan's doctors were unable to isolate an organism. The Vaccine Act specifically precludes consideration of idiopathic, unexplained, unknown, hypothetical, or undocumentable causes.[38] Simply put, there is no agent or cause other than the DPT vaccine which has been proven to cause Nathan's condition.

Based on the above, the undersigned finds that petitioner is entitled to compensation.

## IV.

## AMOUNT OF THE AWARD

### 1. *Statutory framework:*

In retrospective cases,[39] the Vaccine Act provides for the following compensation: actual unreimbursable expenses incurred from the date of the judgment and reasonable projected unreimbursable expenses which (1) result from the vaccine-related injury; [40] (2) have been or will be incurred

---

that he believes the vaccine caused Nathan's injuries.

34. *Tinnerholm,* 411 F.2d at 50, 52–53. In *Tinnerholm,* the court found proximate cause without positing exactly how DPT caused the encephalopathy. The district court noted that although "the occurrence of encephalopathies following administration of vaccines containing a pertussis component has long been known, ... the specific element that causes this explosive assault to the brain has not been discovered." 285 F.Supp. at 444.

35. *Accord Tinnerholm,* 285 F.Supp. at 437 (discussing "sepsis" as a *"bacterial* infection of the bloodstream") (emphasis added).

36. *Id.* at 440 (finding "defendant's suggestion that the cause of [the encephalopathic] damage was a viral encephalitis caused by some unspecified virus, or a sepsis or meningitis, or an allergic reaction, totally unconvincing").

37. *Shaw, supra* n. 33 (respondent's "suggest[ion]" of non-vaccine related etiology does not satisfy standard of proof).

38. Section 13(a)(2)(A).

39. Retrospective cases are those in which the vaccine was administered prior to October 1, 1988.

40. Section 15(a)(1)(A)(i).

by or on behalf of the person who suffered the injury;[41] and (3) have been or will be for diagnosis and medical or other remedial care,[42] or (4) have been or will be for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses and facilities.[43]

The Vaccine Act further specifies that the amount of compensation for residential and custodial care should be sufficient to enable the vaccine-injured person to remain living at home.[44] In cases where, as here, the petitioner suffered an injury rather than death, the Vaccine Act also permits compensation for loss of earnings and pain and suffering.[45] Finally, the Vaccine Act prohibits compensation for other than the health, education or welfare of the vaccine-injured person.[46] Petitioner's request for compensation is detailed in Exhibit 11, the Life Care Plan for Nathan Loe prepared by Dr. David Rollins.[47]

### 2. *Nathan's status:*

At seven years of age, Nathan is considerably better off than many vaccine-injured children. He does not have a continuing seizure disorder or significant medical problems, nor is he expected to suffer convulsions in the future. Nathan goes to school, rides a bicycle, plays with other children, and therefore at first glance might appear like a normal little boy. However, since the administration of his second DPT vaccination, Nathan has suffered marked developmental delays and exhibits significant learning impairment.

Despite extremely attentive parenting and an aggressive and creative scholastic regime,[48] Nathan is at the very bottom of his first grade class. School officials have urged the Loes to remove Nathan from his mainstream public school class and place him into a special education program.[49] Nathan cannot read, demonstrates no word attack skills, and does not know all of the alphabet. Although he can recognize some symbols and numbers, he is not able to take that information and apply it to the "process of word creation ... or detection." Tr. at 72. He has difficulty following multi-step directions. Nathan's I.Q. has been tested at 83, placing him in the lower fifth percentile.[50] He also has a language disorder. As Nathan grows older, both Dr. Schimshock and Dr. Rollins expect the intellectual disparity between Nathan and his peers to increase.

Physically, Nathan suffers from a subtle

41. Section 15(a)(1)(A)(ii).

42. Section 15(a)(1)(A)(iii)(I).

43. Section 15(a)(1)(A)(iii)(II).

44. Section 15(c).

45. Section 15(a)(3) and (4). However, in retrospective cases, Congress imposed a $30,000 cap on the aggregate of attorneys' fees and costs, pain and suffering and lost wages. Accordingly, such determination must be deferred until the attorneys' fee decision is rendered. *See* Section 15(b) and Vaccine Rules 10(b) and 13.

46. Section 15(d)(2).

47. Dr. Rollins is a rehabilitation specialist. He has both a master's degree and a Ph.D. in rehabilitation. Dr. Rollins has been a faculty member in rehabilitation and special education at the University of Oklahoma Medical Center and Syracuse University. Ex. 10. Currently, he is a consultant in private practice, developing life care plans for patients suffering catastrophic or non-catastrophic injury, illness, or disease. Dr. Rollins has reviewed Nathan's medical, educational, and psychological records, and performed evaluative tests on the child. He has observed Nathan at his school a number of times and visited him in his home.

48. The Loes took Nathan to occupational therapy classes almost immediately after his DPT reaction. He continued in similar therapy programs until he was three years old and his parents enrolled him in Montessori school.

49. Currently, Nathan's school provides him with some daily special education in addition to his regular class.

50. Dr. Rollins testified that Nathan's intellectual resources place him in the low average to dull normal range. Dr. Schimshock believes, given Nathan's current demonstrable reading skills and the increasing sophistication of testing

left hemiparesis.[51] He has balance and coordination problems. Nathan falls often. He runs into things. He has trouble throwing or catching a ball. In combination with his gross motor deficits, Nathan's fine motor skills are not comparable to children his own age. He cannot tie his shoes and holds a pencil awkwardly. He is not adept with eating utensils.

In addition to his intellectual and physical infirmities, Nathan has poor self-help skills and is beginning to suffer social handicaps. He is unable to make friends with children of his own age. He is clinically hyperactive, causing behavioral problems for which school officials have urged his mother to place him on drug therapy. He frequently has temper tantrums which disrupt the classroom. Nathan has a significant attention deficit and problems with impulsiveness; his frustration tolerance level is low. He is often unable to make decisions.

Both Dr. Schimshock and Dr. Rollins agree, given the aggregate of Nathan's problems, it is extremely unlikely that he will ever live independently. The Loes want to keep Nathan with them until he is 21. After that time, they would like to place him in a structured living environment out of the home.

### 3. *Reasonableness of Petitioner's Requests* [52]

#### A. MEDICAL–HEALTH CONSULTATIONS

##### i. *Primary Care Physician*

Petitioner has requested two annual visits with a primary care physician at a cost of $90 each. Such services are needed to monitor Nathan's condition, examining growth and developmental landmarks and insuring his medical care is adequate, and to prevent future compromise. Assessment by such a provider is reasonable. However, Dr. Rollins testified that one

yearly visit is the standard of care for a normal healthy child. Accordingly, one additional visit at $90 per year from now throughout Nathan's life expectancy is allowed.

##### ii. *Physiatrist*

Dr. Rollins recommends one visit annually with a physiatrist at a cost of $150. The physiatrist would monitor Nathan's motor developments to determine whether additional medical interventions would aid him in developing a higher level of motor skill. Given Nathan's motor deficits, such treatment is reasonable and will be allowed until he reaches the age of 21.

##### iii. *Neurologist*

Petitioner has requested a yearly pediatric neurological evaluation until Nathan reaches 21 and an adult neurologist visit annually thereafter, at a cost of $165 per year. The undersigned notes that Nathan is not expected to suffer recurrent seizure activity. However, Nathan's last EEG, taken in 1985, was slightly abnormal. In addition, his mother testified that Nathan occasionally has staring periods, possibly indicative of convulsive episodes. Continued annual monitoring by a neurologist at the requested rate is therefore reasonable and necessary.

##### iv. *Child Psychiatrist*

Psychiatric consultation is requested once annually at a cost of $125. The likelihood that Nathan's condition will cause him to suffer emotional and psychological problems is very high. Petitioner's experts feel that his low frustration tolerance in combination with his intellectual and social deficits will make him susceptible to significant depression. Indeed, he is already concerned that his classmates think he is stupid. In light of the marked psychiatric and adjustment problems Nathan is likely to face, annual psychiatric consultation until

---

methods as a child ages, that his I.Q. may in fact be lower.

**51.** A hemiparesis is a muscular weakness or partial paralysis affecting one side of the body. *Dorland's* at 745.

**52.** Dr. Rollins ascertained what services currently are available to Nathan through existing local, state, and federal resources. His life care plan projects the items which he believes are reasonably necessary to supplement those provided through existing public services.

Nathan reaches the age of 21 is reasonable and allowed.

## B. ALLIED HEALTH AND HUMAN SERVICES [53]

### i. Psychological Guidance Counseling

Petitioner requests four counseling sessions per year at $100 per visit. Dr. Schimshock testified that since children with Nathan's problems,

> ... don't really look different than most other kids, the expectations are extremely high, and they become very frustrated. Frequently they'll get turned off and won't try particularly, ... turn inward and, ... take themselves out of competition.

Tr. at 99. Four annual counseling sessions to supplement those that will be available to Nathan through the public school system are reasonable and supported by the record.

### ii. Neuro-psychological Consultation

Petitioner requests one neuro-psychological consultation per year at $350. Dr. Rollins testified that the neuropsychologist would assess any changes in Nathan's cognitive skills and behavior to monitor his progress and determine whether other interventions or therapies are necessary. The undersigned finds such a request reasonably necessary in order in insure that Nathan's neurological and psychological progress is both monitored and coordinated.

### iii. Nutritional–Dietary Consultation

Dr. Rollins recommends an annual nutritionist consultation. He explained that hyperactive children "have a whole different calorie and nutritional need than do children who are not hyperkinetic." Tr. at 137. Nonetheless, Mrs. Loe described Nathan as active and strong. On the record before me, there is simply not enough evidence about Nathan's particular dietary deficits to justify such an award and accordingly, this request is denied.

### iv. Physical/Neuro–Developmental Therapy

Petitioner requests three physical/neuro-developmental therapies per year at a cost of $90 per session. As Dr. Rollins explained, no therapy coordinator "has ever visited [Nathan's] home. No one knows any thing about his lifestyle or his circumstance so that they could develop any kind of supplemental programs for him to engage in the home environment." Tr. at 137. Because it is critical to integrate the services Nathan is receiving from public sources into his home setting, petitioner's request is reasonable and allowed.

### v. Occupational Therapy

Dr. Rollins testified that Nathan will need an annual occupational therapy session in conjunction with the services available from existing public infra-structures. Because of his left hemiparesis and fine motor deficits, one occupational therapy visit yearly at $75 is reasonable and supported by the record.

### vi. Socio–Recreational Therapy

Petitioner has requested two socio-recreational therapy sessions per year at a cost of $55 per visit. Dr. Rollins elaborated,

> ... [Nathan is] going to need continuing assistance from an outside source in showing him what the resources are in his community that he can engage in so that all of his life doesn't center around a strict home environment and then secondarily an educational environment.... [To] develop good skills and abilities and social skills he's going to need to be assisted in that regard, and those kinds of services are not available through the school.

Tr. at 137. For Nathan, who lacks ability and initiative to take advantage of available resources, such services are reasonable and will be allowed at the rate requested.

---

**53.** All compensable items in this category are granted until Nathan reaches the age of 21. After that time, funds are being provided to place Nathan in a group home which includes all appropriate therapeutic, guidance, and counseling services.

#### vii. Social Work Consult

Petitioner has requested an annual social work consult at a cost of $135 per session. A social worker would review the therapeutic interventions and act as a case manager, clearly envisioned under the Act. Such request is allowed.

#### viii. Speech/Language Pathology

Petitioner requests an annual speech/language evaluation at a cost of $165. Because Nathan has been diagnosed as suffering from a language disorder, petitioner's request is reasonable and supported by the record.

#### ix. Cognitive Therapy

Insufficient evidence appears on the record explaining what cognitive therapy entails and why it is necessary in this case. Accordingly, petitioner's request is disallowed.

#### x. Behavior Modification

Currently, Nathan's parents are supposed to reinforce in their home environment the behavior modification the child receives at school. Mrs. Loe testified that it is difficult for her to set limits on Nathan and to implement these behavioral therapies at home. Petitioner's request for an annual behavior modification visit at home, at a cost of $150, is allowed.

#### xi. Educational Tutoring

Petitioner requests six educational tutoring sessions per year at a cost of $35 per session. Given Nathan's significant learning disorder, he is undoubtedly a candidate for tutoring services. However, the record does not reflect how these six sessions will contribute to Nathan's education above and beyond the services he will be eligible for through public education. Without such evidence, their utility appears marginal, and accordingly, no award for such services is allowed.

#### xii. Respite Care

Petitioner requests eight hours per week of respite care at $6.50 per hour.[54] Mrs. Loe has testified that she is unable to spend significant time with her daughter because of the attention Nathan demands. In addition, unlike most children, as Nathan gets older his need for supervision will likely increase. Dr. Rollins believes that as Nathan reaches puberty, his judgment deficits will cause him to be susceptible to anti-social behavior, and the need for supervision will become more crucial. The undersigned finds four hours per week of respite care at $6.50 per hour is reasonable and supported by the record.

#### xiii. Counseling Services for Family Members

Petitioner has requested psychological counseling for family members. The Loes have been extremely concerned about Nathan and attentive to his needs. The undersigned is confident that Nathan's family would benefit from such services, particularly as Nathan grows into adulthood. However, on the record before me, there is not enough evidence that such an award would benefit *Nathan's* health, education, or welfare, and as such, petitioner's request does not fall within the items of compensation permitted by the Act.

### C. DURABLE GOODS AND EXPENDABLE COMMODITIES

#### i. Skill Development Equipment/Physical Conditioning Devices

Petitioner requests skill development equipment at a cost of $1,440, to be replaced once every seven years. This equipment includes a rowing machine, an exercycle, and therapy mats to carry out Nathan's various therapies. There is ample evidence on the record regarding Nathan's hemiparesis, his balance and coordination problems, as well as his general gross motor impair-

---

**54.** Mrs. Loe works full-time, leaving the house at 7:30 a.m. returning at 5:30 p.m. Mr. Loe is in the process of starting his own business. Nathan walks to school with his sister and returns around 2:30 p.m. The undersigned notes that although a neighbor checks on Nathan every day after school, there is not a babysitter in the home between 2:30 p.m. and 5:30 p.m. when Mrs. Loe returns from work.

ment and physical delays. Dr. Rollins testified that there is,

> ... a real danger with youngsters especially like Nathan to develop what's called a disuse syndrome where when they discover that they have a weakness or a limitation, they quit using the appendages that are impaired.

Tr. at 142. Accordingly, the undersigned finds the provision of three development equipment packages, one now, one in seven years, and one when Nathan reaches the age of 21 reasonable and supported.[55]

### ii. Personal Computer (hardware)

Petitioner requests one personal computer with hardware peripherals to be replaced every eight years at a cost of $2,995 per unit. Dr. Rollins testified that a personal computer system would reinforce the educational experiences Nathan is receiving at school and allow him to develop and continue those experiences at home. Nathan has a significant learning disorder, leaving him far behind his classmates. The undersigned finds it reasonable that exposure to the variety of educational computer programs will enhance his scholastic abilities. The undersigned finds the award of two personal computers, one now and one in eight years reasonable and supported.

### iii. Television–Integrated VCR/Video Camera

The Act prohibits an award of essentially recreational or personal comfort items. Dr. Rollins stated that this video equipment would be "a part of [Nathan's] ongoing recreation as well as therapy." Tr. at 142. Where an item appears on its face to be recreational as opposed to therapeutic, the petitioner must have substantial justification for its inclusion in the award. On the record before me, the evidence is simply inadequate to conclude that these items are sufficiently justified.

### iv. Miscellaneous Growth and Development Supplies

Petitioner requests that $965 be provided every seven years for computer and television/VCR and video camera software. Because funds for a television and VCR are disallowed, no accompanying software can be provided. The undersigned requested petitioner's counsel to submit evidence regarding the price of miscellaneous growth and development supplies, excluding television/VCR software equipment. Petitioner's counsel submitted a letter stating that Dr. Rollins informed him that "all of the expenses in the category miscellaneous growth and development aids and supplies are unrelated to the television-integrated VCR and video camera." As an initial matter, the undersigned notes that such supplemental evidence should be in affidavit form. Moreover, Dr. Rollins stated at the hearing that the miscellaneous category consisted of the "software for both the computer and for the TV–VCR." Tr. at 142, 163. It is unclear from the current record precisely what this category contains. Although computer software alone would likely be allowed, as any estimate on the part of the undersigned as to the cost of such items would be conjecture, funds for miscellaneous growth and development supplies are disallowed.

### D. RESIDENTIAL CARE

As both Dr. Rollins and Dr. Schimshock concluded, given Nathan's significant deficits, it would be unreasonable to project that he will become self-sufficient. He lacks both the judgment and the ability to assume responsibility for his actions or to manage his affairs independently. Nathan has difficulty distinguishing right from wrong, he is a poor decisionmaker, and he is unable to process information either readily or accurately. It is unlikely that he will ever be able to read, or to function competitively in the job market. Nathan is at high-risk for a behavioral disorder. Accordingly, the undersigned finds residential

---

**55.** The undersigned notes that at age 21, provision is made for Nathan to move into a group home. However, because many group homes do not have physical conditioning equipment, provision is made for the purchase of such equipment at age 21 so that Nathan can use it at the group home.

care after the age of 21 is necessary and appropriate.

Dr. Rollins investigated group homes, cottage living arrangements, and similar accommodated living environments in the Loe's locality. He found three programs, run in conjunction with the Center for Neuro-educational Therapies, which he believes are appropriate. The cost of placement in these facilities ranges from $1,875 per month with limited supervision to $3,250 per month with more direct supervision. As Dr. Rollins explained, "in the less direct supervision [program], there's a ratio of approximately one monitor or supervisor to every six to eight clients." In the program providing more direct supervision,

> [T]he ratio of supervision is approximately one to three or four, ... and [the cost] also includes ongoing reinforcement therapy in the form of physical therapy, occupational therapy, speech and language therapy, any of the therapies that one might need to carry on over into adulthood.... [It also] includes psychological ... and guidance counseling.

Tr. at 129. The undersigned finds an award of $3,250 per month fair and reasonable. Once Nathan reaches the age of 21, he will no longer be eligible for the bulk of public and social services for which he now qualifies. Nathan's condition is unique: it is unlikely that he will be severely enough impaired to entitle him to continuing public support, yet he will not be adequately equipped to lead even a near-normal life. Provision of funds for the more comprehensive program alleviates the necessity of projecting the additional psychological, therapeutic, and guidance services which Nathan will need once he reaches the age of 21 and is no longer able to avail himself to the services of public education.

4. *Adjustments to compensation award*

### A. REIMBURSEMENT FROM OTHER SOURCES

The Vaccine Act provides for compensation only for expenses which are "unreimbursable." Section 15(a). The award shall not include costs "for any item or service" to the extent that payment reasonably can be expected from an insurance policy or under a state or federal compensation program (other than Title XIX of the Social Security Act). Section 15(g). Dr. Rollins has already taken into consideration those items and services available to Nathan under existing state and federal programs. However, he did not factor in the coverage of private insurance.

As of May 25, 1990, Nathan is covered under Mr. Loe's individual health insurance policy through State Farm Insurance Company. Ex. 24, 25. The policy provides for a $500 deductible per person per year per injury or sickness. After reaching that deductible, the policy pays for 80% of covered services. The policy covers children under the age of 23 and children over age 23 who are unmarried and mentally retarded or physically handicapped. In addition, the child must be incapable of self-sustaining employment and chiefly dependent on the policyholder for support and maintenance. The policy also qualifies,

> [i]n consideration of the issuance or restatement of this policy, it is hereby understood and agreed that the insurance thereunder shall not cover nor shall any benefit be payable for Nathan Loe for cerebral palsy or any complications, ... treatment or operation.

Ex. 25 at 15.

Initially, the undersigned notes that the majority of the items of compensation awarded in this case is not "medical" within the terms of the policy and therefore would not be covered. The lion's share of the award in this case is in residential care costs. Under Mr. Loe's policy, the only type of permanent care institutional coverage is hospitalization. The policy specifies that such an institution must be licensed by the state as a hospital and accredited by the Joint Commission on Accreditation of Healthcare Organizations. Rest or convalescent homes are specifically excluded. Given the State Farm policy constraints, it is unlikely that any of the costs would be covered for the type of group home envisioned herein.

Moreover, of those services which are likely to be considered medical, the insur-

ance company may well exclude them as related to Nathan's cerebral palsy. As required by the Act, the items awarded herein are all related to Nathan's vaccine injury. The rider in Nathan's insurance policy essentially excludes similarly vaccine-related complications and treatment. Even were a few of the compensable items arguably covered under the policy, the $500 per person, per injury annual deductible would subsume those *de minimis* amounts. Accordingly, the undersigned finds that reimbursement by Mr. Loe's insurance policy cannot reasonably be expected.

## B. REDUCTION TO NET PRESENT VALUE

Section 15(f)(4) requires that the final award be based on the net present value of all of the items of compensation. It is within the court's discretion to select the proper method of calculating the amount needed to provide for the future care of an injured person. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. at 552–53, 103 S.Ct. at 2558 (1983). One way to calculate net present value, is to apply a discount rate to the calculation in today's dollars based upon the difference between the predicted future nominal rate of return on a prudent investment and the predicted rate of inflation.[56] The estimation of these two rates is necessarily speculative.

A second way to meet the projected needs of a petitioner under the Act is in the form of an annuity. Special masters are explicitly empowered to order the purchase of an annuity. Section 15(f)(4). Annuities offer distinct advantages: they insure a specific stream of payment; they protect the corpus of the award from mismanagement or waste by the parent or guardian; and they are competitively priced.[57] In this case, the undersigned finds it in the best interests of the petitioner to order that compensation be paid in the form of an annuity.[58]

In order to award an annuity, the undersigned is obligated to predict a future inflation rate to insure that future payments will be sufficient to meet projected future costs. Residential care costs make up the vast majority of this award. Petitioner's economist, Dr. Cathleen Leue,[59] testified that the applicable inflation rate for Nathan's residential care was 6.02% based on the average inflation rate of housing rental since 1978 as reported in the Consumer Price Index. The undersigned does not find that the housing rental rate of inflation is predictive of the inflation for services Nathan is going to receive. A 4% cost

56. *See* Testimony of Dr. Cathleen Leue, Tr. at 184 *et seq.*

57. The relatively low cost of benefits under an annuity plan is possible because of two factors. The first relates to certain assumptions made about life expectancy by the insurance company with which the annuity is placed. While petitioner indicates that Nathan will live out his full remaining life expectancy, annuity companies will assign Nathan a rated age. The competitive determination of reduced life expectancy produces a reduced estimation of payments and a reduced present value of the annuity contract. The company, however, assumes the risk that Nathan may live longer than expected by the medical underwriters and is willing to guarantee monthly benefits as long as he lives.

The second factor is the favorable tax treatment afforded to periodic payments of judgments or claims under certain circumstances. Under the Internal Revenue Code § 104(1)(2), awards and settlements of claims involving personal injuries and illnesses are not taxable as long as the plaintiff has not taken actual or constructive control of the funds. *See* Rev.Rule 79–220, 1979–2 C.B. 74. The award herein is based on the assumption that the annuity will be purchased by the United States government directly from the insurance company. This procedure complies with the rules and regulations of the Internal Revenue Service and avoids any possibility that the beneficiary will be construed as having actual or constructive control of the funds. The funds will thereby qualify as tax free for both beneficiary and the insurance company. If the petitioner were to purchase the same annuities, the costs would be substantially higher.

58. Payment to cover the first year of costs, however, shall be excluded from the annuity contract and instead be awarded in one lump sum.

59. Dr. Leue has a Ph.D. in economics from Washington State University. She has taught economics at the University of Oregon and San Diego State University. She has worked as an economist with the United States Department of Labor. Currently, she is the director of the Social Sciences Information Center at the University of Oregon. Ex. 13.

escalator has been found reasonable in many cases under the Vaccine Act.[60] However, the undersigned concludes that a 5% escalator would be more reasonable in this case. Group home costs, which include allied health care costs, make up the bulk of the award in this case. The higher inflation rate for such items justifies a 5% cost escalator.

## V.

### CONCLUSION

For the reasons cited above, petitioner is hereby awarded an amount sufficient to provide, in future monthly payments, the stream of income necessary to cover the requested items deemed reasonable herein, as compensation for the vaccine-related injuries of Nathan Loe.[61]

Payment shall be made in the form of an annuity. Respondent shall purchase and take ownership of an annuity contract or contracts from an A+ (Superior) company with a rating of Class VI or better.[62] That contract or contracts shall guarantee the stream of payments outlined herein and calculated in the attached Appendix for the duration of Nathan Loe's life. The final contract shall assume a cost escalator of 5%.

IT IS SO ORDERED.

### APPENDIX

With the exception of the first year's expenses, which shall be paid in a lump sum, the annuity awarded herein shall be structured to provide a monthly stream of benefits. The annualized present cost of the future unreimbursable medical, rehabilitative and other expenses allowed herein is as follows: Petitioner is awarded in a lump sum $7,972 to cover the first year's projected expenses. With the exception of Nathan's 15th and 16th years, from 1991 until 2004 when the child reaches the age of 21, the cost will be $3,537 per annum. In Nathan's 15th year, 1997, the payment shall equal $4,977. In his 16th year, 1988, the payment shall equal $6,532. In the year 2004, the payment shall be in the amount of $40,695. From 2005, when Nathan is 22, for the remainder of his life the annuity shall provide $39,255 annually. The actual annuity payout shall reflect the 5% cost escalator relied upon herein.

| 1990 | 1991–1996 | 1997 | 1998 | 1999–2003 | 2004 | 2005–life |
|------|------|------|------|------|------|------|
| $7,972 | $3,537 | $4,977 | $6,532 | $3,537 | $40,695 | $39,255 |

---

**60.** See e.g., Latorre v. Secretary of Health and Human Services, No. 89–27V, slip op. at 14, 1990 WL 290313 (Cl.Ct. June 15, 1990) and cases cited therein.

**61.** The annualized present cost of the future payments is set out in the Appendix, attached hereto.

**62.** All insurance companies are evaluated by A.M. Best's rating service. The A+ (Superior) rating reflects the company's consolidated performance. A company's class is determined by financial size, based upon the company's policyholders' surplus plus conditional or technical

reserves. *See* Best's Agents Guide to Life Insur- ance Companies (1989). A Class VI company has policy holders' surplus and conditional re- serve funds ranging from $25 million to $50 million dollars.