411 F.2d 48
 Eric R. TINNERHOLM, an infant under the age of fourteen years, by his Guardian ad Litem, Carl F. Tinnerholm, and Carl F. Tinnerholm, individually, Plaintiffs-Appellees,
v.
PARKE, DAVIS & CO., Defendant-Appellant.
 No. 315.
 Docket 32697.
 United States Court of Appeals Second Circuit.
 Argued February 11, 1969.
 Decided May 23, 1969.
 
 Jacob D. Fuchsberg, New York City (Richard E. Shandell, and Fuchsberg & Fuchsberg, New York City, on the brief), for plaintiffs-appellees.
 William H. Hillier, Chicago, Ill. (Joseph M. Costello, and Costello, Ward, Tirabasso & Shea, New York City, R. R. McMahan, Chicago, Ill., and David C. Dethmers, Detroit, Mich., on the brief), for defendant-appellant.
 Before ANDERSON and FEINBERG, Circuit Judges, and MANSFIELD, District Judge.*
 ANDERSON, Circuit Judge:
 
 
 1
 This is an appeal by the defendant, Parke, Davis & Co., from a judgment in a personal injury action which held that Parke, Davis' biological product, Quadrigen, was defective and that the defect caused injuries to plaintiff Eric Tinnerholm, then 3 months old, which have left him permanently disabled, both physically and mentally. The District Court awarded total damages in the amount of $651,783.52. We hold there was no error.
 
 
 2
 On the basis of substantial evidence the trial court found that about noon on Saturday, November 28, 1959, the infant plaintiff, Eric Tinnerholm, then sound and healthy in body and mind, was inoculated by Dr. Gerald Feinberg with Quadrigen. On Tuesday morning, December 1, 1959, about 4:00 a. m., the child was found tangled up in his bedclothes and whimpering, but on being picked up and patted he quieted down and presumably went back to sleep. There was no indication of temperature at that time. Sometime later, between 6:30 and 7:00 a. m., the child's mother found him huddled under the covers, lethargic and bathed in perspiration. His temperature at that time was 108°, he was very white, his lips were blue, and he was limp. Dr. Feinberg was summoned, and he arrived about 7:30 a. m. He had the baby admitted to Huntington Hospital at 8:45 a. m. where the infant remained until December 18, 1959. During this time the baby developed recurrent convulsive seizures and paralysis of the right arm and leg. At the time of trial he was, and will remain, mentally retarded (with a mental age of five months) to a degree classified within the idiot-imbecile range; he is paralyzed in both right limbs and still suffers occasional seizures.
 
 
 3
 Quadrigen was developed by Parke, Davis as a quadruple antigen[1] product, combining pertussis (whooping cough) vaccine, with diphtheria and tetanus toxoids and with the Salk polio vaccine. In the early 1940's, a method of combining pertussis vaccine with diphtheria and tetanus toxoids into a triple antigent product (colloquially known as "DTP") had been devoloped. The Parke, Davis DTP was marketed under the trade name "Triogen."
 
 
 4
 Vaccines are intended to stimulate the production of antibodies in order to confer protection against disease by introducing an antigenic factor into the body of the recipient. In developing a vaccine in the cases of some infectious organisms, notably diphtheria and tetanus, it has been possible to isolate a soluble toxin or poison excreted by the bodies of these bacteria, and to inactivate this toxin with formaldehyde, thereby converting a toxin into what is called a toxoid. A toxoid preserves the ability to immunize against the disease by stimulating the production of antibodies in the recipient, although it has lost its own poisonous qualities.
 
 
 5
 In contrast, the bacterial organism which causes pertussis is so complex that it has been impossible to isolate and inactivate the toxin or poison. Since the ingredient in the pertussis bacteria which stimulates the production of protective antibodies has not been isolated, pertussis vaccine consists of whole pertussis bacteria, treated to remove their propensity to cause the disease, while preserving their ability to stimulate the production of protective antibodies.
 
 
 6
 Some fifteen or sixteen different antigens have been described in the pertussis organism, including an exotoxin, an endotoxin, a protective antigen, etc. One or more of these antigens confers protective ability; no one knows which one or what it is. In the production of the pertussis vaccine, the exotoxin is destroyed by heat, but the endotoxins inside the cell survive such treatment. Because of the complex nature of the pertussis bacteria and the inability to isolate the toxin in order to inactivate it, reactions to pertussis vaccine are not uncommon. There may be local reaction, such as soreness or tenderness at the site of the injection, and systemic (attacking the entire body) reaction such as fever and general discomfiture. Rarely, reactions associated with the disease itself, such as convulsions, high fever, or even brain hemorrhage and mental retardation occur.
 
 
 7
 All vaccines require a preservative to keep them sterile; and one of the problems confronting Parke, Davis in the development of Quadrigen was the selection of an appropriate preservative to protect the final product from contamination. In the development of pertussis vaccines and indeed all other vaccines, up until the development of polio vaccine (licensed for distribution in 1956), the preservative universally used was merthiolate. The preservative used in Parke, Davis' Triogen had been merthiolate, but because merthiolate had a deleterious effect upon the polio virus in the Salk vaccine, a new preservative had to be chosen. The preservative ultimately selected by Parke, Davis (and according to Parke, Davis, all other manufacturers of quadruple antigen products) was benzethonium chloride (trade name Phemerol). Quadrigen was developed during 1957 and 1958 and was licensed for commercial distribution by the National Institutes of Health in the spring of 1959. The first commercial distribution took place July 10, 1959.
 
 
 8
 The findings of the court below in support of its conclusion that Parke, Davis is liable to plaintiffs-appellees may be summarized as follows:
 
 
 9
 1. "* * * by manufacturing Quadrigen in the method chosen by defendant, the chances of contracting an encephalopathy were enhanced,"[2] because:
 
 
 10
 2. "* * * the effect of the use of benzethonium chloride was to release the endotoxin from the bacteria cell into the fluid that was injected. One such endotoxin, the lipopolysaccharide, causes fever * * *"; and
 
 
 11
 3. "* * * the release of the endotoxin into the fluid injected into the infant plaintiff was the cause of the unusually high fever which, in turn, caused the severe and permanent brain damage."
 
 
 12
 The main thrust of appellant's appeal is directed toward a claimed lack of proof by the plaintiffs-appellees that the Tinnerholm baby's injuries were proximately caused by Quadrigen. The testimony of plaintiffs' expert witness, Dr. Joseph H. Lapin, a pediatrician, provided substantial support, however, for the chain of causation which the court found. Dr. Lapin qualified to testify as an expert on his testimony that he had been a practitioner in pediatrics for more than forty years, that he was Professor of Pediatrics at Albert Einstein Medical College and had written extensively "on various phases of whooping cough, the disease, method of treatment of the disease * * and immunization against it." It was his opinion that the benzethonium chloride caused the leaking of endotoxins from within the cell wall of the pertussis organism when maintained in a solution such as Quadrigen.[3]
 
 
 13
 There was also corroborating evidence to support the District Court's finding on this point in an article by Dr. Margaret Pittman, Pertussis Vaccine Testing for Freedom-from-Toxicity," published in Applied Microbiology, and included in appellant's evidence. Writing in 1965, Dr. Pittman said:
 
 
 14
 "Recent work has shown that pertussis vaccine in DTP-P [diphtheria-tetanus-pertussis-polio vaccine] preserved with benzethonium chloride is unstable in potency * * *. This surface-acting preservative, no doubt, contributed to the greater toxicity of DTP-P * * by favoring the leaching of the toxin from the bacterial cell. It is well known that alkalinity favors lysis and thereby promotes toxicity * * *.
 
 
 15
 Merthiolate apparently acts as a stabilizer of potency * * *. It is the most effective preservative known for pertussis vaccine."
 
 
 16
 The appellant attacks the weight to be given this statement by pointing out that Dr. Pittman, called as a witness for Parke, Davis, referred to her 1965 statement as only an opinion or "scientific hypothesis." A review of her testimony indicates, however, that this is precisely the kind of opinion evidence which is within the competence of an expert witness, i. e. drawing inferences from basic scientific data.
 
 
 17
 There remains the question whether or not a causal link was established between the release of the endotoxin and the infant plaintiff's injuries. Dr. Pittman testified that one toxic component of pertussis vaccine is the lipopolysaccharide endotoxin, to which the fever following the administration of pertussis vaccine is usually ascribed. "There have been a number of publications on (sic) attempting to explain why this lipopolysaccharide does incite fever."
 
 
 18
 Plaintiffs-appellees rely on two statistical studies to support their assertion that the incidence of febrile reactions in children was higher with Quadrigen than with Triogen. One was mentioned in the testimony of Dr. William McLean, Jr., director of Parke, Davis' department of microbiology, and also a pediatrician. In making a comparison of groups treated with Triogen and another treated with Quadrigen he said with regard to the febrile reactions that "there was a somewhat higher rate of temperatures over 102 in the group receiving Quadrigen," but he was of the opinion that from the standpoint of comparative statistical evaluation, this had no significance because there were certain variations in different lots of Quadrigen and the same types of variations appeared in different lots of Triogen. Even so, the trial court could attach weight to the disclosure that Quadrigen produced more cases in the highest temperature brackets.
 
 
 19
 The other study was reported in an article by Dr. Louis W. Sauer which contains the following statement to which the trial court could have also attached weight:
 
 
 20
 "Local and febrile reactions thus far have been transient-fever somewhat more frequent, occasionally higher than after adjuvant-containing triple antigen. The author administered Quadrigen to large groups of young institutionalized infants (mostly under 6 months of age) without any adverse reactions. There was no rise in rectal temperature in approximately 60%; 101 F. in 12%; 102 F. in 10%; 103 F. in 8%; 104 F. in 5%; and 105 F. in 2%."
 
 
 21
 Dr. Lapin testified that he had worked on this subject in his use of Triogen for 21 years, 1942-1963, and it was "very clear" that he had never had fever percentages, in his use of Triogen, of the sort Dr. Sauer found in his Quadrigen study.
 
 
 22
 In spite of appellant's argument that there is no expert medical testimony whatsoever to demonstrate a correlation or connection between febrile reactions and encephalopathies, the following testimony by Dr. McLean, who was directly in charge of the Quadrigen product, was sufficient to support the lower court's findings on this point:
 
 
 23
 "We believe that the so-called post-pertussis encephalopathies aren't a single group of entities, but may have a number of etiologies, and some may be caused by one thing and some by another. You have mentioned fever. This is a recognized one."
 
 
 24
 There was also ample testimony that 105° is a critical level with regard to propensity of high fevers to cause convulsive seizures and brain damage.[4]
 
 
 25
 The appellant argues that Dr. Lapin stated on cross-examination that "we could never think of high fever producing encephalitis. That is impossible." But the appellees point out that Dr. Lapin had previously defined "encephalitis" as "an inflammation due to an infection," which is separate and distinct from "encephalopathy," which refers to brain injury from toxic substances.
 
 
 26
 Finally, it should be noted that both of plaintiffs' expert witnesses, Dr. Lapin and Dr. Charash, testified that in their opinion Eric Tinnerholm suffered a post pertussis vaccine encephalopathy, resulting from the toxicity of the Quadrigen injection. The trial court was also justified in finding and giving weight to the facts that Quadrigen is capable of causing exactly the symptoms that occurred to the infant plaintiff and that no other apparent cause of these symptoms was ever brought to light.
 
 
 27
 We therefore hold that there was sufficient evidence to support the finding of the court below that defendant-appellant, Parke, Davis' product "Quadrigen was defective and that the defect was the proximate cause of the injury sustained by Eric Tinnerholm." Since appellant does not dispute the District Court's ruling that this finding justifies the imposition of liability on an implied warranty of merchantability theory, it is unnecessary to discuss the alternative basis of liability which rests on negligence theories.
 
 It is now settled law in New York that
 
 28
 "A breach of warranty * * * is not only a violation of the sales contract out of which the warranty arises but is a tortious wrong suable by a noncontracting party whose use of the warranted article is within the reasonable contemplation of the vendor or manufacturer."
 
 
 29
 Goldberg v. Kollsman Instrument Corp., 12 N.Y.2d 432, 436, 240 N.Y.S.2d 592, 594, 191 N.E.2d 81, 82 (1963). Accord: Rooney v. S. A. Healy Co., 20 N.Y.2d 42, 46-47, 281 N.Y.S.2d 321, 325, 228 N.E.2d 383 (1967). The New York Court of Appeals stated the rule as follows:
 
 
 30
 "[W]here an article is of such a character that when used for the purpose for which it is made it is likely to be a source of danger to several or many people if not properly designed and fashioned, the manufacturer as well as the vendor is liable, for breach of law-implied warranties, to the persons whose use is contemplated."
 
 
 31
 Kollsman, supra, 12 N.Y.2d at 436-437, 240 N.Y.S.2d at 594-595, 191 N.E.2d at 83. As the court below found, it cannot be disputed (and appellant does not disagree) that a drug manufacturer impliedly warrants under New York law that its products will not prove to be unreasonably dangerous, in a manner not contemplated by the attending physician, and that the manufacturer is liable for the personal injuries caused by an unreasonably dangerous product. The New York Court of Appeals has referred to this as "strict tort liability." Id.
 
 
 32
 We next turn to the question of damages. The appellant disputes the award of $33,000 to the father for past medical expenses, which is based on the theory that the State could recover that sum from the parent under New York Mental Hygiene Law, McKinney's Consol. Laws, c. 27, §§ 24(4) (a) and 24(9) (b). Section 24(4) (a) provides that a patient cared for in a State institution and the parents of such a patient are jointly and severally liable for all cost and charges. Under § 24(5) (b) the State has a lien on the recovery in this action. Section 24(9) (b) authorizes State officials at their discretion to fix the amounts charged for care at the officially determined reimbursement rates, or less than such rates. The plaintiff father paid $40 per month which was less than full reimbursement to the State. The court below allowed the father to recover these payments as part of the $6,283.52 awarded as recovery of medical expenses paid. As the father is not liable for the unpaid balance of $33,000, found by the court, he should not recover for it. The infant plaintiff, however, is liable for that amount because under § 24(9) (b), if the amounts charged are less than the reimbursement rate, the patient remains liable for the difference, though the parents do not. In re Unseld's Estate, 44 Misc.2d 649, 254 N.Y.S.2d 744 (Surrogate Court 1964). Therefore, we direct that the judgment be amended to delete this amount from the award made to the plaintiff father but to add it to the amount awarded to the infant. We are satisfied that there was competent evidence to support the finding that there was a liability of $33,000 for these expenses; but there is the possibility that this sum or some portion thereof will constitute a windfall to the infant plaintiff if the State should fail to seek reimbursement. We, therefore, hold that the award for liability for past medical expenses is conditioned upon a lien in that amount, or any lesser reimbursement figure which is established and recovered by the State pursuant to §§ 24(5) (b) and 24(9) (b). The defendant shall not be required to pay any part of the $33,000 not so liened and recovered by the State.
 
 
 33
 The appellant challenges the award of $160,000 for future medical expenses on the ground that the past State charge of $40 per month is the only competent evidence on the question. This, however, ignores the $6,000 estimated annual cost of State institutional care, as well as Dr. Charash's testimony that private institutional care, which would benefit both parents and child, would cost $8,000 or $9,000 per year. It also ignores the liability imposed by § 24(9) (b). Taking into account the benefits of private nursing and therapy, as well as the rising costs of medical expenses, and accepting 50 years as a reasonable life expectancy, there is ample support for the District Court's award of $160,000 for future medical expenses, which is modest indeed.
 
 
 34
 The appellant also disputes the award of $50,000 for loss of future earnings. Allowing for a 5% discount factor and making the assumption that the infant would not have commenced work until age twenty-one, the District Court made an award which assumed an earning capacity of approximately $4,000. It is our opinion that this award was very conservative and in no sense unfair to the appellant. Grayson v. Irvmar Realty Corp., 7 A.D.2d 436, 184 N.Y.S.2d 33 (1st Dep't 1959).
 
 
 35
 The appellant challenges the award of $2,500 to the plaintiff father for loss of the child's services because of the decision by the New York Court of Claims in the case of Coish v. State of New York, 23 Misc.2d 117, 203 N.Y.S.2d 748 (1960), which appellant asserts, "held that there could be no award for loss of services where there is a lack of proof that the child lived with the father after the accident." This misconstrues Coish; there, the court held that the father of a child who sustained minor injuries in an automobile accident and who required two days of hospitalization but who suffered no residual injuries, was not entitled to an award for loss of services, because there was no proof as to any such loss and the child did not live with the father after the accident. That case is readily distinguishable from the present action and the claim is without merit.
 
 
 36
 The appellant also challenges the award of $400,000 for pain and suffering because, in the cases relied upon by the court below "evidence was adduced to show constant pain and suffering and a conscious awareness by the plaintiff of his catastrophic permanent condition," whereas the infant plaintiff in the case at bar, with a mental age of approximately 5 months, has virtually no cognizance of his own tragic condition. It is indisputable that the damage award for pain and suffering in each of those cases, see Christopher v. United States, 237 F. Supp. 787, 799 (E.D.Pa.1965) (considerable disfigurement, humiliation and anxiety); Schwartz v. United States, 230 F.Supp. 536, 543 (E.D.Pa.1964) (torment of the fear of recurrence, and disfigurement); Wolfe v. General Mills Inc., 35 Misc.2d 996, 231 N.Y.S.2d 918, 923 (Sup. Ct.1962) (humiliation and embarrassment of his present condition), emphasized the relationship between the plaintiff's ability to reason and his suffering. But the New York courts have recognized the impossibility of formulating a precise standard by which "to measure the pain or to compensate for it in money damages," Wolfe, supra; and it follows that the trier of fact must be allowed a fairly broad discretion in resolving this issue. Although the $400,000 award for pain and suffering is high, we are not persuaded that it was reversible error. On this issue the court below found:
 
 
 37
 "He has undergone two spinal taps and a craniotomy, is partially paralyzed and subject to seizures. He is not comatose, however, he is not a vegetable."
 
 
 38
 We read this statement to emphasize the "pain" which the infant plaintiff has suffered, is suffering and will continue to suffer irrespective of the element of distress associated with cognizance and the ability to reason and understand.
 
 
 39
 The simple fact remains that there is more to pain than the sense of personal tragedy. Since the infant plaintiff is estimated to have a mental age of five months, and he is not comatose, there is ample support for the finding that he was capable of suffering "pain" in its direct, primary sense. See Vaughn v. United States, No. 6021 (W.D.Wash., Feb. 2, 1965); Hill v. Fifth Avenue Coach Lines (Sup.Ct.N.Y., no date given).
 
 
 40
 Viewing the award of damages as a whole, we conclude that the trial court's judgment should not be overruled. Cf. Stromsodt v. Parke-Davis and Co., 257 F.Supp. 991 (D.N.D.1966). To the extent that the amount of the allotment for pain and suffering may have been somewhat high, it was more than offset by the very low estimates for care and other medical expenses and for the loss of earnings. The latter was based on an assumption of annual earnings of $4,000, which is little more than that of the sum paid to a person on relief. In the circumstances into which he was born and with the fair expectation that they would continue, it is likely that he would have had a yearly compensation, after reaching 21 years of age, considerably in excess of the figure adopted.
 
 
 41
 There is no error and the judgment of the district court, as modified by the reallocation to the infant plaintiff of the sum of $33,000 for past medical expenses, subject to the condition above mentioned, is affirmed.
 
 
 
 Notes:
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 Appellant's "Glossary of Medical and Scientific Terms" defines "antigen" as follows: "Substance which causes anti-bodies to be produced by organism into which it is injected." Brief at A-2
 
 
 [2]
 This and similar references are to the Joint Appendix on appeal
 
 
 [3]
 "Q. * * * When the potency [of the pertussis vaccine in Quadrigen] is reduced or was reduced following the use of the new preservative, do you have an opinion, with a reasonable degree of medical certainty, based on your general knowledge in this area, and your experience, as to whether that was due to the effect of the substitution of the benzethonium [chloride] * * * as the preservative in place of the merthiolate? A. Yes, I would think so. I would think in the light of our knowledge, the considerable work that has been done since this accident, we might call it, it seems very evident that the benzethonium chloride dissolved the outside of the bacteria thus releasing toxins into the fluid that we injected
 * * * * *
 Q. You say that Phemerol leaches out, so to speak — A. Yes.
 Q. — the wall of the cell and releases endotoxins, those toxins contained * * * [inside the cell wall?] A. Right." (98a)
 
 
 [4]
 For example, Dr. McLean testified: "I would say that 105° can produce convulsions in people in which there is, as far as we know, no underlying factor" (1050a). And the following testimony by Dr. McLean certainly indicates that Dr. Sauer's finding (that 2% of the children to whom Quadrigen was administered had temperatures of 105°) suggests that all was not right with Quadrigen:
 "If we take a group of, say, 100 children who are all presumably normal, and we induce fever into these children, some will have convulsions at a fairly low level of fever, say 102 — a very few. As we gradually increase this temperature, the incidence of convulsive seizures will increase, and as we get up to the 106-107 range, nearly all the children will have convulsions. The figure of 105 I think can be taken as about the mean temperature at which we would expect about half the children in a given population to have convulsions." (Emphasis added.) (1115a.)