James K. EDGAR and Mary K. Edgar on behalf of Jamie K. EDGAR, their daughter, Petitioners,

v.

SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–711V.

United States Claims Court.

April 28, 1992.

---

Patrick J. Gilmartin, New York City, attorney of record for petitioners.

David L. Terzian, Washington, D.C., with whom was Asst. Atty. Gen., Stuart M. Gerson, for respondent.

## ORDER

HARKINS, Senior Judge:

Petitioners, on behalf of their daughter Jamie K. Edgar, seek review in the United States Claims Court under the National Vaccine Injury Compensation Program (the Program) of a special master's unpublished decision, filed October 24, 1991. Respondent also seeks review of the special master's decision.

The Program was established in 1986 as part of the National Childhood Vaccine Injury Act, Pub.L. No. 99–660, tit. III, § 311(a), 100 Stat. 3743, 3758. Amendments in 1987, 1988, 1989, 1990, and 1991 changed substantially procedures applicable to the functions of special masters, and review of decisions of special masters. Provisions governing the Program, as amended, are contained in 42 U.S.C.A. §§ 300aa–10 through 300aa–34 (West 1991 & Supp.1992). For convenience, further reference to the Program in this order will be to the relevant subsection of "42 U.S.C.A. § 300aa – ––."[1]

Jamie K. Edgar was born on May 25, 1984. She received DTP vaccinations on July 26, October 26, and December 6, 1984, apparently without incident. She had no serious medical problems until she received DTP booster and oral polio vaccinations on June 27, 1989. On June 28, 1989, she was sent to the emergency room at Somerset

---

1. The Health Insurance, Health Promotion, and Vaccine Injury Compensation Amendments of 1991, Pub.L. No. 102–168, 105 Stat. 1102 (Nov. 26, 1991), amended Section 300aa–12(g)(2) which requires notice to a petitioner when the Claims Court fails to enter a judgment on a petition within 420 days, exclusive of suspension and remand periods. The 1991 amendments substituted provisions giving petitioner an option to have the petition remain before the court, in lieu of the former provision which provided that the petition will be considered withdrawn if petitioner, special master or the court fail to take certain actions. The petition in this case was filed on Aug. 1, 1990. Proceedings were suspended a total of 60 days by orders dated July 29 and Sept. 6, 1991. Accordingly, the 420–day period expired Nov. 26, 1991. This order constitutes notice to petitioner pursuant to Section 300aa–12(g)(2), as amended.

Medical Center, Sommerville, New Jersey with a temperature of 101.9°. On July 2, 1989, she had a first seizure, and thereafter she developed intractable seizures, which are very difficult to control. Tests done in September 1989 showed cerebral atrophy. By December 6, 1990, management of her prolonged seizures required regular administration of three anti-convulsants. She has features of a persistent vegetative state together with evidence of a spastic biparesis, and bilateral optic atrophy. She is in coma level II–III, and is entirely dependent on hospital staff for all areas of daily living. She has no independent ambulation, no bowel and bladder control and is fed through a tube which has been artificially placed in the abdomen. It is clear that Jamie has had a significant and apparently irreversible insult to her brain. Jamie currently is in a comatose state and is institutionalized in a long term care facility in New Jersey, where her bills are being paid through Medicaid. Medicaid is not an offset under the statute.

Respondent, in its January 3, 1991, report, conceded entitlement, and the matter proceeded to a determination of appropriate damages. Two special masters have been responsible for the proceedings. The petition establishes a post-Act (prospective) case. Damages include future medical expenses, lost future earnings, past and future pain and suffering, and past unreimbursed expenses related to the care and well-being of the injured person. Section 300aa–15(a)(1), (3) and (4).

In an unpublished decision on August 23, 1991, the special master awarded an annual amount of $172,526.06 for future medical expenses. This amount was directed to be provided through an annuity based on an annual growth factor of 4 percent, purchased from an insurance company, and owned by respondent. Both parties accept the decision on future medical expenses.

The special master in the August 23, 1991, decision noted that petitioners were entitled to an amount for lost wages and an amount for pain and suffering. The parties were directed to supply further information as to life expectancy and weekly earnings figures required by Section 300aa–15(a)(3)(B).

Shortly after the August 23, 1991, decision, the special master left government service. On September 6, 1991, the case was assigned to a new special master.

On October 24, 1991, the new special master filed a decision that incorporated by reference statements made in a bench ruling given on October 23, 1991. The October decision reaffirms the terms and criteria of the prior award for future medical expenses. In addition, the October 24, 1991, decision awards a lump sum payment to petitioners for pain and suffering and lost earnings, apportioned in the bench ruling as follows:

| | |
|---|---|
| Past Pain and Suffering | $100,000 |
| Future Pain and Suffering | 50,000 |
| | |
| Total | $150,000 |
| | |
| Lost Earnings | $127,048 |
| | |
| Total Lump Sum Payment | $277,048 |

In its motion for review, respondent challenges only the $50,000 award for future pain and suffering. Plaintiff's motion for review challenges the October 24, 1991, decision as to: (1) the total amount of the injured child's lost future earnings capacity, (2) the net present value of the total amount of such lost future earnings capacity, and (3) refusal to make an award to compensate petitioners for past unreimbursed expenses related to the care and well being of the injured child.

*Standard of Review*

■ A special master's decision may not be disturbed by the Claims Court unless the court finds it to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. The 1989 Amendments defined the Claims Court function in a review of a special master's decision in Section 300aa–12(e)(2), as follows:

(2) Upon the filing of a motion under paragraph (1) with respect to a petition, the United States Claims Court shall have jurisdiction to undertake a review

of the record of the proceedings and may thereafter—

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the court's direction.

The report of the Conference Committee on the 1989 Amendments emphasized that an appeal to the Claims Court was to be "under very limited circumstances." The report states:

The Conferees have provided for a limited standard for appeal from the master's decision and do not intend that this procedure be used frequently but rather in those cases in which a truly arbitrary decision has been made.

H.R.Conf.Rep. No. 101–386, 101st Cong., 1st Sess., at 517, *reprinted in* 1989 U.S.Code Cong. & Admin.News 1906, 3112, 3120.

This limited scope of review is tailored to the concepts and objectives of the Program. The standard "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" is based on one of the criteria established by the Administrative Procedure Act (APA). 5 U.S.C. § 706 (1988). To the extent consistent with Program objectives to be attained through the Office of Special Masters, decisions interpreting the APA standard have application in a review of a special master's decision. Under the APA standard, conclusions of law are considered de novo. *Rice v. Wilcox*, 630 F.2d 586, 589 (8th Cir.1980). On issues of law, recognition should be given to the special master's expertise in the development of the procedures in this novel Program. A decision on issues of law applicable to the Program should be over-

turned only when error is unmistakenly clear.

When the Claims Court reviews a special master's decision, the court is required to engage in a searching and thorough review, but the scope of the inquiry is limited. The Claims Court may not substitute its own judgment for that of the special master. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–24, 28 L.Ed.2d 136 (1971). The special master's decision must articulate a rational connection between the facts found and the choice made. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). "Arbitrary and capricious" includes decisions where the special master has relied on factors which Congress has not intended to be considered, or has entirely failed to consider an important aspect of the problem, or has offered an explanation of the decision that runs counter to the evidence, or is so implausible it could not be ascribed to a difference in view or a product of expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

The "arbitrary and capricious" test in Section 300aa–12(e)(2)(B) is a highly deferential standard of review. "If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Secretary of the Dep't of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed.Cir.1991).

*Pain and Suffering*

■ The petition alleges that Jamie has sustained, and will in the future sustain pain and suffering and emotional distress, and requests an award of $250,000, the maximum amount permitted by the Act. The special master awarded a total of $150,000 for pain and suffering.

Respondent asserts that the special master's award of $50,000 for future pain and suffering is arbitrary and capricious and counter to the weight of evidence in the record. Respondent asserts there is no

indication in the medical records, or any other evidence submitted by petitioners, that Jamie presently experiences or perceives pain, suffering, or emotional distress in her daily experience.

The parties agree that, as a necessary foundation for an award for pain and suffering, there must be evidence that the injured person has some minimal amount of awareness. Petitioners assert that the record is replete with such evidence. In the bench ruling the special master denied petitioners an opportunity to add to the record relative to the pain and suffering issue. One reason for the denial was because the special master found additional testimony "unnecessary given the wealth of information in the medical records." The medical records submitted with the petition relative to April, May and June 1990, show that Jamie, even though in coma level II is sufficiently aware of herself and her surroundings to respond to loud noises, to take certain foods by mouth, and chew, to respond to bright lights, to withdraw her hand from textures she finds unpleasant, and to grasp at a therapist when off balance and to hold on until her balance is restored. The overall picture that emerges from a review of Jamie's medical history is that of a child that is permanently and almost totally destroyed, but who has retained sufficient sensory and cognitive functions to be able to suffer and feel fear and pain.

In the award for future pain and suffering, the special master relied upon Jamie's medical records referenced in the petition. In addition to these records the special master supported his decision by reference to other cases such as *Schafer v. Secretary of the Dep't of Health & Human Servs.*, No. 89–122, slip op. at 5–6 (Cl.Ct. Oct. 10, 1991) ("It is not the function of a reviewing judge to substitute his or her judgment for that of the special master, especially on the issue of [pain and suffering], when the master's decision was not unreasonable."); *Tinnerholm v. Parke, Davis & Co.*, 411 F.2d 48 (2d Cir.1969) (after noting wide discretion given to trial judges, appellate court sustained a lower court's high pain and suffering award); *Frankel v. United States*, 321 F.Supp. 1331 (E.D.Pa.1970), *aff'd sub nom., Frankel v. Heym*, 466 F.2d 1226 (3rd Cir.1972) (money judgment for pain and suffering affords plaintiff feelings of satisfaction, pleasure or gratification which operate to offset the pain which has been undergone); *Delosovic v. New York* 143 Misc.2d 801, 541 N.Y.S.2d 685 (1989), *aff'd*, 174 A.D.2d 407, 572 N.Y.S.2d 857 (1st Dept.1991) (claim that victims regained consciousness long enough to feel pain and suffering was speculative and therefore not sustainable); *Niles v. Big Sky Eyewear*, 236 Mont. 455, 771 P.2d 114 (1989) (exception to *Delosovic*-type rule); *Jones v. Wal–Mart Stores, Inc.*, 870 F.2d 982 (5th Cir.1989) (law presumes that mental suffering will follow severe injury); and *Hoskie v. United States*, 666 F.2d 1353 (10th Cir.1981) (where brain damage is involved, a more flexible definition of pain and suffering must be used).

An objective reading of the medical records supports the conclusion that Jamie is sufficiently aware of herself and her surroundings to justify an award for future pain and suffering. In the bench ruling, the special master recognized respondent's objection to an award for future pain and suffering and petitioners' arguments in favor of such an award. In light of the exceedingly vague standards applicable to awards for pain and suffering, the special master's award is conservative. Jamie may be expected to live out her normal lifespan, which could be another 50 years. The $50,000 award for future pain and suffering would amount to a little over 3 dollars per day over the rest of her life.[2] This figure may be compared to the $200,000 in pain and suffering damages the 5th Circuit approved to compensate an accident victim who survived only 100 days after the accident. *Swift v. State Farm Mut. Auto. Ins. Co.*, 796 F.2d 120 (5th Cir.1986). The victim in *Swift* also was comatose, and there was conflicting evidence about his capacity to feel pain. The Fifth Circuit did

---

**2.** This assumes Jamie's experience of pain and suffering for the rest of her life will be constant, and disregards any appreciation in $50,000 invested today.

lower the trial court's initial award of $400,000 to $200,000, but it felt that the facts, which are similar to those here, justified such an award. In the light of the broad discretion afforded to a special master's findings of fact, the special master's decision as to an award for past and future pain and suffering, on this record, must be sustained. Section 300aa–12(e)(2)(A).

*Lost Future Earnings*

■ For post-Act cases, the Program provides compensation for actual and anticipated loss of earnings. The calculations for loss of earnings give effect to the time in the injured person's life that the vaccine-related injury was sustained—*i.e.*, before or after attaining the age of 18. Section 300aa–15(a)(3) provides:

(3)(A) In the case of any person who has sustained a vaccine-related injury after attaining the age of 18 and whose earning capacity is or has been impaired by reason of such person's vaccine-related injury for which compensation is to be awarded, compensation for actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections.

(B) In the case of any person who has sustained a vaccine-related injury before attaining the age of 18 and whose earning capacity is or has been impaired by reason of such person's vaccine-related injury for which compensation is to be awarded and whose vaccine-related injury is of sufficient severity to permit reasonable anticipation that such person is likely to suffer impaired earning capacity at age 18 and beyond, compensation after attaining the age of 18 for loss of earnings determined on the basis of the average gross weekly earnings of workers in the private, non-farm sector, less appropriate taxes and the average cost of a health insurance policy, as determined by the Secretary.

Calculations for loss of earnings after a vaccine-related injury impairs earning capacity involves a number of variable assumptions, particularly when the injury occurs to infants under the age of 18, and records of earning capacity of such an individual are nonexistent. Variables include projected lifespan, work life beyond 18 years, economic conditions when age 18 is to be reached, education, social position, work force category, and offsetting costs.

Petitioners' calculations under Section 300aa–15(a)(3)(B) of projected future earnings for Jamie involved estimates of a work life period after attaining age 18, with adjustments for educational and professional levels. Petitioners made four projections of total work life earnings. These projections varied from $1,772,553.78 (no allowance for fringe benefits, high school education only, historical work life of 29.6 years for high school educated female (to year 2032)); to $2,875,367.05 (no allowance for fringe benefits, college education, median of historical male and female work life for college educated persons (34.8 years to year 2041)). Respondent's calculation of Jamie's total work life earnings was $1,649,119.51 (no allowance for fringe benefits, high school education only, estimated work life of 29 years for high school educated female (to year 2032)).

Both parties applied a discount rate of 7.04 percent, to their estimated total work life earnings to derive a net present value of Jamie's lost future earnings. Petitioners calculated a net present value at January 1, 1992, of $282,234 for a work life after a high school education only, and a net present value of $287,434 for a work life after a college education. Respondent calculated a net present value of $254,886.35 for the work life after a high school education only.

Petitioners object to the special master's analysis of Section 300aa–15(a)(3)(B) in the determination of the gross amount of Jamie's lost future earnings. Petitioners also object to the special master's determination of the net present value of Jamie's lost future earnings.

The special master held that Section 300aa–15(a)(3)(B) provides a complete formula for the determination of lost future earnings of a person who sustained a vaccine injury before the age of 18. Petitioners argue that Section 300aa–15(a)(3)(B) does not limit the factors which are rele-

vant to the computation, but rather its provisions are a flexible guide or a baseline to be used as a foundation from which the award is to be derived.

The special master considered and rejected petitioners' contentions in the bench ruling. Interpretation of the meaning of a statute is a question of law. The special master's interpretation is reviewed de novo, and in keeping with Program objectives is to be overturned only when error is unmistakenly clear.

Section 300aa–15(a)(3) provides two calculations for loss of future earnings: Subsection (A) covers injured persons aged 18 and over, and Subsection (B) covers injured persons under age 18 who have no employment history and may not attain earning capacity at age 18. The calculation under Subsection (A) is an individualized assessment "determined in accordance with generally recognized actuarial principles and projections."

Subsection (B) lists specific elements to be taken into account: severity of the injury, likelihood of impaired earning capacity at age 18 and beyond; and a calculation "determined on the basis of the average gross weekly earnings of workers in the private, non-farm sector, less appropriate taxes and the average cost of a health insurance policy, as determined by the Secretary." This sets forth a precise formula on how to compute the earnings loss.

Petitioners argue, primarily through analysis of the dictionary definition of the word "basis" in Subsection (B), that although Congress has mandated (a) when future lost earnings for injured persons may be considered, (b) how such future lost earnings shall be computed, and (c) who determines the value of both of the explicit deductions applied, the section is not a precise, mathematical formula. Petitioners ignore the statute as a unified document to be given consistent meaning. Given the context in which the word "basis" is used, its plain meaning is that the lost earnings figure must be established, built or computed with reference to the figures referred to in the statute.

The statutory provisions applicable to loss of earnings must be read so as to give meaning to all of their terms, consistent with the objectives of the entire Program. An interpretation that would render Subsection (B) superfluous is to be avoided. Acceptance of petitioners' interpretation would make Subsection (B) mean the same as Subsection (A), and, as a result, redundant.

The special master's analysis of Section 300aa–15(a)(3) is far from "clearly mistaken." Therefore, it must be sustained. *See Chula Vista City Sch. Dist. v. Bennett,* 824 F.2d 1573, 1579–80 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 861 (1988). Inasmuch as Subsection (B) provides a complete formula, there is no need to consider fringe benefits, the effect of a college education, or the expected rate of growth of earnings due to experience or productivity.

The special master's award for lost future earnings was included in a lump sum payment to petitioners. This decision was predicated on the conclusion that Jamie's only chance of benefiting from the lost earnings was immediate availability in the form of a lump sum. In order to assure that the lump sum payments are used solely on behalf of the injured child, the decision requires petitioners to provide evidence "to respondent within 90 days after receipt of payment that the judgment was provided to the proper officials in the State of New Jersey charged with overseeing guardian expenditures on behalf of a minor or incapacitated individual."

Section 300aa–15(f) provides for the payment of compensation under the Program. Payment in post-Act cases are authorized in Section 300aa–15(f)(4)(A) as follows:

Except as provided in subparagraph (B) [for retrospective cases], payment of compensation under the Program shall be determined on the basis of the net present value of the elements of the compensation and shall be paid from the trust fund in a lump sum of which all or a portion of the proceeds may be used as ordered by the special master to purchase an annuity or otherwise be used,

with the consent of the petitioners, in a manner determined by the special master to be in the best interests of the petitioner.

Respondent's calculations as to Jamie's total work life earnings of $1,649,119.51 were accepted by the special master, and respondent's calculation of $254,886.35 as one way to measure net present value was recognized. The special master, however, used the cost of an annuity which would provide a stream of payments that would equal Jamie's total lost earnings as representative of net present value. That cost was determined to be $127,048.

Petitioners contend that the use of the cost of an annuity as a measure of the net present value of lost earnings is incorrect as a matter of law. Petitioners claim that a premium quotation for an annuity is not a measure of net present value of anything. Inasmuch as the statute requires a net present value to be determined before a purchase of an annuity can be ordered, petitioners argue that the cost of the annuity is irrelevant to a determination of net present value. Petitioners argue that the award should be either the net present value they calculated ($282,234) or the value respondent calculated ($254,886.35). Further, the annuity quotation is based on the premise Jamie will die before the end of what would have been, pre-injury, her normal expected work life. The annuity cost is calculated on the basis of a "rated age." Petitioners point out that the only evidence in the record is that Jamie post-injury has a normal life expectancy, and case law precedent establishes that award for lost earnings (unlike awards for future medical care) are to be predicated on pre-injury life expectancy.

"Net present value" is a economic concept that represents the market value of a contractual promise to pay the beneficiary a larger value in the future. The concept of net present value is pertinent where, as here, there is a lump sum award. Courts long have recognized that the data used to set annuity values is competent evidence in a determination of present value. *Vicksburg & Meridian R.R. Co. v. Put-*
*nam,* 118 U.S. 545, 554, 7 S.Ct. 1, 2, 30 L.Ed. 257 (1886); *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 552–53, 103 S.Ct. 2541, 2558, 76 L.Ed.2d 768 (1983); *see also Scott v. United States,* 884 F.2d 1280, 1287–88 (9th Cir.1989) (concerning the relevance and admissibility of the cost of a single-premium annuity as a measure of net present value).

The Claims Court has held that the special master may order the purchase of an annuity without petitioners' consent to such mechanism of payment. *See Ruben v. Secretary of the Dep't of Health & Human Servs.,* 22 Cl.Ct. 264 (1991); *Huber v. Secretary of the Dep't of Health & Human Servs.,* 22 Cl.Ct. 255 (1991); *Loe v. Secretary of the Dep't of Health & Human Servs.,* 22 Cl.Ct. 430 (1991).

A common calculation to reach net present value is to reduce the future value by the discount rate to determine the amount of money which, if invested today, will yield the already calculated future value in a particular number of years. This method of calculation is not the sole method to determine net present value. Present value also may be measured by the cost of an annuity. This value generally will be much less than a net present value calculated by application of a discount rate.

The relatively low cost of benefits under an annuity plan is possible because of two factors. The first relates to certain assumptions made about life expectancy by the insurance company with which the annuity is placed. Annuity companies assign the covered person a rated age that differs from life expectancy projections. Life expectancy reduced to the rated age produces a reduced estimation of payments and a reduced present value of the annuity contract. The annuity company, however, assumes the risk that the covered person may live longer than expected by the medical underwriters and is willing to guarantee lifelong monthly benefits. *See Loe,* 22 Cl. Ct. at 447 n. 57. The net present value determined by either method will provide a stream of payments the sum of which will equal the projected total work life earnings.

Petitioners seem to argue that there is only one way in which to determine "net present value" of a future stream of benefits. This is simply not accurate. Not only are there different methods, there are different applications of the same method. For example, economists will offer different opinions of the data upon which projections should be made, what kind of projections are necessary, and what a particular projection should be given a certain data subset. In the Program, special masters necessarily have the discretion to choose how to make this calculation in any given case.

It would be contrary to the objectives of the Program to award petitioners the right to make their own investment decision, and charge against the Vaccine Injury Compensation Trust Fund, a lump sum payment generated by a high cost method of calculation.

Petitioners elevate form over substance in their contention that Subsection (A) must be construed so as to require that present value be calculated without regard to the cost of an annuity. The annuity would give Jamie every dollar to which she is entitled for vaccine-related lost income, for the duration of her life, at a cost of $127,048. The sum produced through calculation of a higher present value by application of the discount rate, if used by petitioners to purchase an annuity, would produce benefits that would be exorbitant, and would bear no relation to the benefits to which she is entitled.

There is no disagreement between the parties that the award of the net present value of future lost earnings is to be made in the form of a lump sum. The special master's award of a lump sum based on annuity cost was proper. Petitioners may purchase a comparable annuity, or they may make another investment that will protect Jamie's interests better.

It is within the special master's discretion to award either a lump sum to petitioners or an annuity owned by respondent. It is within the special master's discretion to choose the method by which present value is determined.

In sum, the special master had the legal authority to determine that the net present value of the loss of future earnings is equivalent to the cost of an annuity. Further, the special master had the ability either to award a lump sum or to order the purchase of an annuity, without the consent of the parties. His choice in this case must be sustained.

*Past Unreimbursed Expenses*

In the transfer of this proceeding to the new special master on September 6, 1991, confusion as to the state of the record arose with respect to past unreimbursed expenses. This confusion resulted in disagreement between petitioners and the new special master which is reflected in a footnote in the October 24, 1991, decision. The footnote in relevant part states:

> Through the court's September 10, 1991, status conference, the resulting Order and the parties' briefs, the issue of past medical expenses was not raised, brought to the court's attention or argued. Accordingly, respondent did not address the issue of past medical expenses. Petitioners were aware of the Act's time constraints in this case yet raised an issue at a point where, even if the court decided that it should be addressed the court could not possibly do so. Therefore, the court finds that the issue of past medical expenses, if it can be considered raised, was raised in an untimely fashion and therefore is considered waived.

The August 23, 1991, decision of the initial special master in fact had ordered that, after additional information was received, the next order would "incorporate the conclusions of this opinion regarding unreimbursed expenses." Petitioners' "Statement of Petitioner's Position on Certain Elements of Awardable Compensation" filed September 23, 1991, pursuant to the order of the new special master in fact made tangential reference to the issue of past unreimbursable expenses: "(d) some small amount of unreimbursed past expenses."

It was petitioners' understanding that an award of past unreimbursed expenses was

not "in issue." Petitioners now argue that respondent waived the issue by never contesting petitioners' request for past unreimbursable expenses until the October 23, 1991, bench ruling. Indeed, at the bench ruling, respondent's counsel made the erroneous statement that there was not a statutory provision for the payment of unreimbursed past expenses.

The record is clear that petitioners did provide evidence of past unreimbursed expenses on March 6, 1991, in a document captioned: "Notice of Filing of Documents Re (1) Unreimbursable Expenses (2) No Civil Action Pending and (3) Lost Earnings." Exhibit A to petitioners' filing showed expenditures actually incurred but denied reimbursement by Blue Cross/Blue Shield or by Guardian Group, petitioners' major insurer. Those expenditures totalled $1,985. Additional expenditures which had been actually incurred but had not been submitted to Blue Cross/Blue Shield or Guardian because they were not within the coverage were itemized in Exhibit B. These expenditures were in the amount of $6,526.98.

There is statutory authority for certain unreimbursable expenses. Section 300aa–15(a)(1)(B) provides, *inter alia*, that the compensation awarded under the Program to a petitioner for a vaccine-related injury or death associated with the administration of a vaccine after the effective date of the subpart "shall include ...

actual unreimbursable expenses incurred before the date of the judgment awarding such expenses which—

(i) resulted from the vaccine-related injury for which the petitioner seeks compensation,

(ii) were incurred by or on behalf of the person who suffered such injury and

(iii) were for diagnosis, medical or other remedial care, rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary."

Respondent concedes that the special master could have awarded the expenses listed in Exhibit A. Exhibit A expenditures include: (a) a $300 insurance deductible; (b) ambulance service to transport Jamie from one hospital to another, to the extent not covered by insurance—$125; (c) the cost of a folding mat for Jamie, no amount of which was covered by insurance—$185; (d) surgical services provided to Jamie, to the extent not covered by insurance—$1,000; and (e) further medical services provided to Jamie, to the extent not covered by insurance—$375.

Respondent, however, contends that none of the expenses listed in Exhibit B of the March 6, 1991, submission properly are reimbursable. Those expenses include: (a) the cost of obtaining a "disabled person" placard and handicapped license plates for Petitioners' automobiles—$24; (b) the total cost of parking at the hospital in which Jamie was being treated—$194; (c) the excess of the cost of Jamie's parents' eating meals at the hospital minus what it would have cost them to eat at home—$975; (d) the cost of mileage to the hospital in which Jamie was being treated—$3,301.98; (e) opportunity cost of Jamie's father's lost overtime pay—$1,232; and (f) opportunity cost of Jamie's mother's lost employment—$800.

Respondent contends that the Exhibit B expenses are not contemplated by Section 300aa–15(a)(1)(B) because: they were not incurred "by or on behalf of the person who suffered such injury" and do not fall within the categories of "diagnosis, medical or other remedial care, rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary."

It may be that all of petitioners' Exhibit B listed expenditures do not satisfy 300aa–15(a)(1)(B). Respondent's failure to put

these expenses in issue until after the bench ruling and to make a record only in this review is not to be excused. *See* RUSCC, Appendix J, Title II, Vaccine Rule 8(f). The special master's announcement of a waiver on this issue was incorrect given the state of the record before him. Respondent is too late to formulate a record in opposition. Exhibit B expenditures in (c), meal costs, and (e) and (f) opportunity costs facially are questionable. Accordingly, petitioners are entitled to all of the Exhibit A expenditures ($1,985) and Exhibit B expenditures ($6,526.98), less items (c), (e) and (f), ($3,007) for a total award of $5,504.98 for past unreimbursed expenses.

On the basis of the foregoing, the findings of fact and conclusions of law of the special master are upheld as to the compensation for future medical expenses, past and future pain and suffering and for lost earnings. The lump sum payment to petitioners is to be increased to a total of $282,552.98 in order to compensate petitioners for past unreimbursed expenditures. The Clerk is directed to enter judgment accordingly.